René P. Voss (CA Bar No. 255758)
Natural Resources Law
15 Alderney Road
San Anselmo, CA  94960
Phone: (415) 446-9027
Email: renepvoss@gmail.com
LEAD COUNSEL

*Attorney for Plaintiffs*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| SIERRA CLUB, EARTH ISLAND INSTITUTE, and SEQUOIA FORESTKEEPER,<br><br>          Plaintiffs,<br><br>     v.<br><br>UNITED STATES FOREST SERVICE,<br><br>          Defendant. | No.:<br><br>**COMPLAINT**<br><br>Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*) |

**INTRODUCTION**

1.      This is a civil action for declaratory and equitable relief, which stems from Defendant's (the "Forest Service") actions related to two large logging and vegetation management projects in the Giant Sequoia National Monument ("GSNM") and the Sequoia National Forest ("SNF").

2.      On December 28, 2023, the Forest Service authorized tree felling and removal, including by commercial timber sale, within the footprint of two recent fires in the GSNM and SNF. The projects are known as the "Castle Fire Ecological Restoration Project" ("Castle"), and "Windy Fire Restoration Project" ("Windy"), or collectively "Projects" (*see* project websites, respectively at https://www.fs.usda.gov/project/?project=59292 (Castle) and https://www.fs.usda.gov/project/?project=62403 (Windy)).

3.      The Project decisions authorize the felling and removal of trees from over 13,000 acres of public forestlands, mostly in the GSNM, but also in the SNF. The Castle and Windy Projects constitute the largest logging projects proposed since the creation of the GSNM. In addition, actions would include vegetation management treatments in the form of pile burning, managed or prescribed burning, reforestation, and meadows restoration.

4.      These actions are in addition to and in combination with emergency actions authorized on July 22, 2022, by the Chief of the Forest Service in a signed a Decision Memorandum that allows tree felling and some removal from 12 giant sequoia groves in the Sierra and Sequoia National Forests, some of which are within the boundaries of the Castle and Windy Fire Projects.

5.      Plaintiffs did not challenge these emergency actions in the GSNM due to their scope, which was limited to a small radius around the larger giant sequoias in each sequoia grove, and because the Forest Service told the public that they would use hand tools and leave most felled trees on site and away from larger giant sequoias in burn piles or scattered away from the larger trees.

6.      The Giant Sequoia National Monument was created on April 15, 2000 by President Clinton to protect the remaining unprotected Giant Sequoia Groves and associated ecosystems in the Sequoia National Forest from "more than half a century of logging that resulted in the virtual removal of most forest in some areas of the monument." 65 Fed. Reg. 24095 (April 25, 2000)

COMPLAINT                                                                                          1

(GSNM Proclamation). "These giant sequoia groves and the surrounding forest provide an excellent opportunity to understand the consequences of different approaches to forest restoration. These forests need restoration to counteract the effects of a century of fire suppression and logging." *Id*.

7.     In protecting the forest from new logging, the Proclamation states that "[r]emoval of trees, except for personal use fuel wood, from within the monument area may take place only if clearly needed for ecological restoration and maintenance or public safety." *Id*. at 24097.

8.     The Forest Service has now authorized the felling and removal of tens of thousands of trees under the guise of ecological restoration, which would adversely and significantly affect public forest lands and resources in the GSNM, including wildlife and associated habitat for threatened, endangered, and other rare or sensitive species.

9.     Although the Forest Service has asserted to the contrary, the removal of thousands of live and dead trees as proposed by these Projects from thousands of acres of the GSNM is not clearly needed for ecological restoration and maintenance. If anything, the Castle and Windy Fires have helped restore forest areas that have recovered naturally for millennia without logging. Indeed, the proposed actions and their accompanying adverse effects are the types of harm the GSNM Proclamation sought to prevent.

10.    Moreover, the types of *major* federal actions proposed in these Projects require detailed analyses in Environmental Impact Statements ("EISs") to pass legal muster and comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h.

11.    Instead, the Forest Service only prepared two Environmental Assessments ("EAs") and associated Findings of No Significant Impact ("FONSIs").

12.    Plaintiffs challenge the sufficiency of the analyses for the two Projects and allege that the Forest Service's actions to log thousands of acres across these geographically, ecologically, and biologically diverse areas are major federal actions that significantly affect the environment, and thus require EISs to comply with NEPA.

13.    By logging sensitive post-fire habitat, the Projects would adversely affect several species listed or proposed for listing under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–44, including the endangered Southern Sierra Nevada Pacific fisher, the endangered gray

wolf, several endangered amphibian species, and the California spotted owl (proposed for listing as "threatened" throughout the Sierra Nevada mountain range), as well as species desinated as "sensitive" by Forest Service, including the northern goshawk and several bat species.

14.     The Projects would adversely affect riparian areas, water quality and carbon storage, increase soil erosion and compaction from logging and log hauling on sensitive post-fire soils, and substantially damage the natural regeneration of trees and other plant species in the Castle and Windy Fire areas.

15.     Rather than take a "hard look" at site-specific direct, indirect, and cumulative effects, the Forest Service's cursory analyses offer only general and conclusory statements that the Projects would not significantly affect proposed, threatened, endangered, and sensitive species, or other sensitive resources in Project areas. The analytical scale of these assessments was simply too coarse for the agency to satisfy its obligations under NEPA, glossing over the potential adverse effects from the Project on these and a myriad of other resources.

16.     During the public involvement process, Plaintiffs implored the Forest Service to consider several reasonable alternatives, including ones that would reduce the size and scope of the Projects. Plaintiffs suggested, *inter alia*, that restoration, as envisioned by the GSNM Proclamation and Plan, could be accomplished without tree removal; without the felling and removal of standing dead trees ("snags"), to preserve wildlife habitat, post-fire soils, and natural regeneration; by only cutting and removing small-diameter trees in the wildland-urban interface to prepare the areas for prescribed burning; and by reducing the size of the proposed action areas.

17.     Instead, the Forest Service dismissed analyzing any of Plaintiffs' proposed alternatives, having already manufactured a purpose and need so slender as to define competing reasonable alternatives out of consideration. After soliciting scoping comments, the Forest Service prepared its "preliminary" Environmental Assessment ("EA") and used the GSNM Plan's decision tree to eliminate the possibility that restoration without tree removal would be considered, stating that it would not meet the stated purpose and need.

18.     After accepting comments on the Castle Project EA, the Forest Service impermissibly narrowed its purpose and need further by stating that any action must also be consistent with its

General Technical Report, titled "*GTR-270 Postfire Restoration Framework*," ("GTR") its "*Post-fire Restoration Strategy for the 2021 Windy Fire, KNP Complex, and French Fire*" ("Strategy"), as well as a Memorandum of Understanding ("MOU") with the State of California, making it impossible for any other action alternatives to meet the stated purpose and need.

19.     Because the Forest Service failed to take a hard look at the potential adverse environmental effects from its action, failed to prepare EISs for these major Federal actions, and failed to consider a reasonable range of alternatives, it has violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*

20.     Moreover, during the public involvement process, Plaintiffs pointed out that the Forest Service's proposal to remove large dead trees ("snags") exceeding 20 inches in diameter was inconsistent with standards imposed by the GSNM Land and Resources Management Plan ("Forest Plan"), which makes no distinction between removing live or dead trees over that size for the purpose of "ecological restoration."

21.     The Plan only allows tree felling or removal above the 20-inch-diameter limit to avert public safety hazards in areas, such as along roads or in recreation sites.

22.     The Projects would allow the logging of dead trees up to 30 inches in diameter in the Castle Fire Area, and would allow the logging of dead trees without an upper diameter limit in the Windy Fire Area for the purpose of "ecological restoration."

23.     Thus, the removal of dead trees (snags) exceeding the 20-inch limit for "ecological restoration" is inconsistent with the GSNM Plan standards.

24.     Moreover, the GSNM Plan includes a standard for managing snags, which must consider their spatial arrangement and density for wildlife needs, and any management must include site-specific considerations, such as a wider range of snag sizes and densities, and focal placement of snags and snag patches.

25.     The Forest Service's project design, which only requires that 4 snags per acre over 12 inches in diameter be left for wildlife, does not include site-specific considerations for wildlife needs in areas planned for snag removal as required in the plan standard for snag management. Further, the 20-inch-diameter limit for felling and removing snags for ecological restoration is not inconsistent

COMPLAINT                                                                                      4

with the snag management standard because these larger snags are highly beneficial for many species of wildlife.

26.     Because the National Forest Management Act ("NFMA") requires that any site-specific project must be consistent with the governing LRMP or "Forest Plan," 16 U.S.C. § 1604(i), and because the Projects exceed the GSNM Forest Plan's diameter limits and are inconsistent with wildlife habitat standards for managing snags, they violate the NFMA.

27.     Because the Projects violate NEPA and NFMA, they and are arbitrary, capricious, and otherwise contrary to law, and thus violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).

28.     Plaintiffs seek a declaration that the Forest Service's authorizations of the Castle and Windy Projects violate these laws and seek an order from the Court that sets asides, vacates, and enjoins the Project Decisions, Environmental Analyses, and Findings of No Significant Impacts.

## JURISDICTION

29.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 701 et seq. (Administrative Procedure Act) and 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act). Plaintiffs have exhausted all administrative remedies, and the violations of law claimed below are ripe for judicial review.

30.     Venue lies in the Eastern District of California, pursuant to 28 U.S.C. § 1391(e), because the property and events giving rise to this suit occur in this District and because Plaintiff Sequoia ForestKeeper resides within the District.

31.     An actual judiciable controversy exists between the parties hereto.

## INTRADISTRICT VENUE

32.     Similarly, because a substantial part of the events or omissions which give rise to the claims herein occurred in Tulare County, assignment to the Fresno Division of this Court is proper under Civil Local Rule 120(d).

## PARTIES

33.     Plaintiff SIERRA CLUB is a 501(c)(4) non-profit organization and the nation's oldest grassroots environmental organization. Sierra Club's members and supporters are dedicated to the

1  purpose of exploring, enjoying, and protecting the wild places of the Earth; practicing and promoting

2  the responsible use of the Earth's ecosystems and resources; educating and enlisting humanity to

3  protect and restore the quality of the natural and human environment; and using all lawful means to

4  carry out these objectives. The Sierra Club has more than 695,000 members nationwide, more than

5  147,000 members in California, and more than 1,223 members in the jurisdiction of its Kern-

6  Kaweah Chapter where the Giant Sequoia National Monument and Sequoia National Forest are

7  located. Sierra Club members enjoy the Castle and Windy Project areas for hiking, birdwatching,

8  wildlife viewing, and experiencing the areas' natural beauty.

9      34.    Plaintiff EARTH ISLAND INSTITUTE ("EII") is a 501(c)(3) nonprofit corporation

10  organized under the laws of the State of California. EII is headquartered in Berkeley, California.

11  EII's mission is to develop and support projects that counteract threats to the biological and cultural

12  diversity that sustains the environment. Through education and activism, these projects promote the

13  conservation, preservation and restoration of the Earth. One of these projects is the John Muir

14  Project, whose mission is to protect all federal public forestlands from commercial exploitation that

15  undermines and compromises science-based ecological management. EII is a membership

16  organization with over 15,000 members in the U.S., over 3,000 of whom use and enjoy the National

17  Forests of California for recreational, educational, aesthetic, spiritual, and other purposes. EII

18  through its John Muir Project has a longstanding interest in protection of national forests. EII's John

19  Muir Project and EII members actively participate in governmental decision-making processes with

20  respect to National Forest lands in California and rely on information provided through the NEPA

21  processes to increase the effectiveness of their participation. EII's members include individuals who

22  regularly use and continue to use public lands within the Southern Sierra Nevada National Forests,

23  including the exact tracts of lands in the Project areas proposed for logging, in particular, for

24  scientific study, recreational enjoyment, aesthetic beauty, and nature photography. These members'

25  interests would be irreparably harmed by the planned logging, as they would no longer be able to

26  scientifically study these areas in their pre-logging state, take nature photographs of the area in its

27  pre-logging state, or enjoy the aesthetic beauty of the unlogged forest habitat and its inhabitants.

28      35.    Plaintiff SEQUOIA FORESTKEEPER ("SFK") is a 501(c)(3) non-profit corporation

residing in Weldon, California. Its mission is to protect and restore the ecosystems of the Southern Sierra Nevada, including, but not limited to, the Giant Sequoia National Monument, Sequoia National Forest, Sequoia and Kings Canyon National Parks, and Mountain Home State Forest through monitoring, enforcement, education, and litigation. SFK's members, many of whom reside in local areas including Kern, Tulare, Fresno, and Kings Counties, and others who visit from across the country, use and continue to use the national forests and parks of the Southern Sierra Nevada for activities such as hiking, bird and animal watching, aesthetic enjoyment, quiet contemplation, fishing, scientific study, and to improve their health, including the exact tracts of the lands and waters that are now planned for logging as part of the Projects. These members' interests would be irreparably harmed by the planned logging, as they would no longer be able to scientifically study these areas in their pre-logging state, take nature photographs of the area in its pre-logging state, or enjoy the aesthetic beauty of the unlogged forest habitat and its inhabitants.

36.    This suit is brought by the Plaintiffs on behalf of themselves and their adversely affected members and staff. Plaintiffs and their members' present and future interests in and use of the national forest areas are and would be directly and adversely affected by the Projects. Those adverse effects include, but are not limited to: (1) impacts to native plants and wildlife and their habitats within and around Project areas from logging; (2) reduction and impairment of recreation opportunities; (3) impaired aesthetic value of forest lands, trails, and landscapes caused by Defendant's logging; and (4) loss of scientific study and viewing opportunities with regard to wildlife in areas proposed for logging. In addition, Plaintiffs and their members and staff have an interest in ensuring that Defendant complies with all applicable laws, regulations, and procedures pertaining to the management of these publicly-owned National Forest lands.

37.    The Forest Service's implementation of the Castle and Windy Projects is in contravention of NEPA and NFMA. Because Defendant's actions approving the Project violate the law, a favorable decision by this Court would redress the actual and imminent injuries to Plaintiffs. If the Forest Service were to comply with NEPA, it would supplement its environmental analyses and prepare EISs to consider the significant effects from the Projects on imperiled species and other natural resources. Such analyses would take a hard look at the direct, indirect, and cumulative effects

from its actions, and consider additional alternatives to the proposed action that could minimize or avert the harms to Plaintiffs' members caused by the logging of trees and destruction of wildlife habitat by the proposed actions. Moreover, if the Forest Service were to comply with the NFMA, it would revise its proposal to limit tree cutting and removal to live and dead trees smaller than 20 inches in diameter and properly protect wildlife habitat where it plans to remove snags.

38.     Defendant UNITED STATES FOREST SERVICE ("Forest Service") is an agency within the U.S. Department of Agriculture, which holds National Forests in trust for the American people and is responsible for the Castle and Windy Fire Projects.

## LEGAL BACKGROUND

**The National Environmental Policy Act (NEPA)**

39.     Congress enacted NEPA "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

40.     Through NEPA, Congress also established the Council on Environmental Quality ("CEQ") to develop national policies to promote environmental quality. 42 U.S.C. § 4342; *id.* § 4344(4).

41.     In 1978, the CEQ promulgated uniform regulations implementing NEPA that remained in force until 2020. *See* 40 C.F.R. Part 1500 (2019). The CEQ modified the regulations in 2020. 85 Fed. Reg. 43,304 (July 16, 2020); *see* 40 C.F.R. Part 1500 (2021). The 2020 CEQ regulations are subject to multiple lawsuits. In 2022, the CEQ rescinded some of the modifications. 87 Fed. Reg. 23,453 (Apr. 20, 2022) *see* 40 C.F.R. Part 1500 (2021). Additional rulemaking proposing broader changes to the 2020 modifications is forthcoming.

42.     The Forest Service promulgated its own set of regulations implementing NEPA, amended most recently in 2020. 85 Fed. Reg. 73,620 (November 19, 2020) (codified at 36 C.F.R. Part 220). The Forest Service is bound by its own regulations.

43.     When the Forest Service issued its Scoping Notice for the Project on October 25,

2021, the 2020 CEQ regulations were in force. At the time of the final decisions, the 2022 CEQ regulations were in force.

44.     Congress amended NEPA through the "Builder Act" contained in the "Fiscal Responsibility Act of 2023." Pub. L. No. 118-5; 138 Stat. 38-46 (Sec. 321). The amendments codify some of the requirements of the 2022 CEQ regulations.

45.     A series of fundamental requirements continued to apply, even if the state of NEPA and its regulations were in flux during the decisionmaking process for the Projects.

46.     NEPA requires all agencies of the federal government to prepare a "detailed statement" that discusses the environmental impacts of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement is commonly known as an environmental impact statement ("EIS"). The EIS must describe the adverse environmental effects of the proposed action and alternatives to the proposed action. *Id.*

47.     Agencies may prepare a less detailed Environmental Assessment ("EA") if the significance of the effects is unknown and the need for an EIS has not been determined.

48.     In the EA, the agency must disclose and consider the direct, indirect, and cumulative effects of the proposed action. *Direct effects* are those caused by the action and occur at the same time and place. *Indirect effects* are those caused by the action and are later in time or farther removed in distance, but still reasonably foreseeable. *Cumulative effects* are those that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable future actions, regardless of the agency (Federal or non-Federal) or person undertaking the actions.

49.     In the EA, the agency must discuss the purpose and need for the proposed action. An agency may not define its objectives in unreasonably narrow terms.

50.     In the EA, the agency must study, develop, and describe appropriate alternatives to the proposed action. The agency must give full and meaningful consideration to and analyze all reasonable alternatives.

51.     The EA must provide sufficient evidence and analysis for determining whether

preparation of an EIS is required, or whether a Finding of No Significant Impact ("FONSI") is appropriate because the proposed action would not have significant effects.

52.     In considering whether the effects of a proposed action are significant, agencies must analyze the potentially affected environment and the degree of effects of the action. In considering the potentially affected environment, agencies should consider the affected area and its resources, including ESA-listed species and critical habitat. In considering the degree of effects, agencies should consider short- and long-term effects, beneficial and adverse effects, effects on public health and safety, and effects that would violate Federal, State, Tribal, or local law protecting the environment.

53.     If substantial questions are raised whether a project may significantly affecting the quality of the human environment, an EIS must be prepared.

54.     An EA is intended to help an agency decide if an EIS is warranted, and is not a replacement or substitute for an EIS.

**The National Forest Management Act (NFMA)**

55.     NFMA is the primary statute governing administration of national forests. Pursuant to NFMA and its implementing regulations, management of national forests occurs at two levels: forest and project.

56.     At the forest level, NFMA requires the Secretary of Agriculture, through the Forest Service, to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System."16 U.S.C. § 1604(a).

57.     The Forest Service, which manages the National Forest System, uses these plans, called "forest plans" to guide all natural resource management activities, including use of the land for "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness."16 U.S.C. § 1604(e). A forest plan is a broad, long-term programmatic planning document for each forest, containing goals and objectives for individual units of the forest and providing standards and guidelines for management of forest resources.

58.     In 1988, the Sequoia National Forests developed its Land and Resources Management Plan ("Forest Plan"). In 2004, subsequent to the adoption of the Forest Plan, the Forest Service

COMPLAINT                                                                                          10

adopted the Sierra Nevada Forest Plan Amendment, or Sierra Nevada Framework, which sets mandatory standards and guidelines for management actions applicable to the Sierra Nevada forests, including the Sequoia National Forest.

59.     In 2012, the Forest Service issued a specific amendment to the Sequoia National Forest Plan for the Giant Sequoia National Monument ("GSNM") that includes additional and more-specific standards and guidelines to protect the GSNM.

60.     In 2023, the Forest Service issued a major revision to the Forest Plan for the Sierra and Sequoia National Forests, including the area of the Sequoia National Forest outside the GSNM. Most of the Castle and Windy Project areas are located in the GSNM, while a small portion of each Project area is located in the Sequoia National Forest outside the GSNM. The Forest Service analyzed the Project areas outside the Monument in accordance with the version of the Forest Plan that preceded the 2023 Sequoia National Forest Plan Revision.

61.     At the project level, once a forest plan is in place, site-specific actions or "projects" are planned and evaluated by the Forest Service. Each site-specific project, resource plan, permit, contract, and other instrument for the use and occupancy of National Forest System lands shall be consistent with the governing forest plan. 16 U.S.C. § 1604(i).

62.     The GSNM Plan states that "[a]ny treatments that involve the removal of trees from within the Monument area, including both standing trees and downed logs, will only be permitted following a determination that removal of the trees is 'clearly needed for ecological restoration and maintenance or public safety' (Clinton 2000, p. 24097)."

63.     The GSNM Plan includes a decision tree that requires the Forest Service to consider managed wildfire, prescribed fire, and mechanical treatments without tree removal for ecological restoration, in that order first, and treatments with tree removal only if other methods do not meet ecological objectives in the project purpose and need.

64.     The GSNM Plan includes a Monument-wide standard for "Vegetation, including Giant Sequoias," which states: "When implementing vegetation and fuels treatments, retain all conifer trees with a dbh of 20 inches or greater in westside forest types. Retain montane hardwoods with a dbh of 12 inches or larger in westside forest types."

65.     Table 46 of the GSNM Plan provides management direction for ecological restoration by specifying tree diameter limits in various land allocations or species habitats in the GSNM, limiting tree cutting and removal to 20 inches in diameter; with additional 12 inch diameter limits for giant sequoias and hardwoods; 6 inch diameter limits within 1-2 acres of California spotted owl and northern goshawk nest trees; and complete avoidance of tree cutting in carnivore den sites outside wildland urban interface defense zones.

66.     Neither standard in the two previous paragraphs make any distinction between live or dead trees (snags).

67.     The GSNM Plan includes a Monument-wide standard for "Wildlife Habitat," specific to snags, which states:

> Manage snag levels for ecological restoration. Within green forests, design projects to provide a sustainable population of medium- and large-diameter snags. Existing medium- and large-diameter snags, as well as medium- and large-diameter living trees that exhibit form and/or decay characteristics regarded as important wildlife habitat (e.g., have substantial wood defect, teakettle branches, broken tops, large cavities in the bole, etc.), will form the backbone snag network over large landscapes.

> In areas burned by wildfire, including high- and mid-severity patches, manage snag levels to meet ecological restoration objectives, with consideration for the spatial arrangement and density of snags for wildlife needs. Include site-specific considerations such as a wider range of snag sizes and densities, and focal placement of snags and snag patches.

68.     In its Project analyses, the Forest Service has defined large snags as standing dead trees over 15 inches in diameter at breast height.

**The Endangered Species Act (ESA)**

69.     Congress enacted the ESA to "provide a means whereby the ecosystems upon which endangered species and threatened species depend must be conserved" and to "provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate."16 U.S.C. § 1531(b).

70.     To achieve these purposes, the Secretaries of Commerce and the Interior are responsible for administering and enforcing the ESA. 16 U.S.C. § 1532(15). The Secretaries delegated this responsibility to the National Marine Fisheries Service ("NMFS") and the United

COMPLAINT                                                                                    12

States Fish and Wildlife Service ("USFWS") (collectively, the "Services"), respectively. 50 C.F.R. § 402.02(b). FWS administers the ESA as to terrestrial and freshwater species, and NFMS administers the ESA as to marine and anadromous species, such as salmon.

71.     The ESA makes it unlawful to "take" any "endangered" species and certain "threatened" species for which protective regulations have been promulgated. 16 U.S.C. §§ 1538(a)(1), 1533(d).

72.     Section 7 of the ESA imposes substantive and procedural obligations on federal agencies like the Forest Service. Substantively, Section 7 provides that federal agencies must "insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the adverse modification of habitat of such species … determined … to be critical." 16 U.S.C. § 1536(a)(2).

73.     Procedurally, Section 7 requires federal agencies (the "action agency") to engage in consultation with the applicable Service (the "consulting agency") before undertaking a discretionary action that may affect listed species or critical habitat. 16 U.S.C. § 1536(a)(2).

74.     If an action "may affect" listed species, the action agency must engage in consultation with the appropriate consulting agency. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

75.     Section 7 consultation is either informal or formal. Informal consultation is a process designed to help the action agency determine whether to engage in formal consultation. 50 C.F.R. § 402.13. If the action agency determines that the proposed action may affect, but is not likely to adversely affect ("MANLAA), listed species or critical habitat, and the appropriate Service concurs in writing, formal consultation is not required. 50 C.F.R. § 402.14(b)(1).

76.     If the action agency decides that the action may affect, and is likely to adversely affect ("MALAA") a listed species, the action agency must engage in formal consultation with the appropriate Service. 50 C.F.R. § 402.14(a).

77.     During formal consultation, the appropriate Service must "formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4). The biological opinion ("BiOp") must be based on the best

COMPLAINT                                                                    13

available scientific and commercial data. 16 U.S.C. § 1536(b).

**The Administrative Procedure Act (APA)**

78.    The APA confers a right of judicial review on any person adversely affected by agency action. 5 U.S.C. § 702.

79.    "Agency action made reviewable by statute and final agency action for which there is no adequate remedy in court are subject to judicial review." 5 U.S.C. § 704.

80.    Upon review, a court shall hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with and/or without observance of procedure required by law. 5 U.S.C. § 706(2)(A),(D).

81.    The issuances of the Castle and Windy Project EAs, FONSIs, and Decision Notices constitute final agency actions.

**FACTS**

**Background**

82.    Wildfires in 2020 and 2021, including the Castle and Windy fires, burned tens of thousands of acres in the GSNM and SNF. Both fires were natural ignitions from lightning strikes.

83.    These fires caused widespread evacuations, damage to property and other damage.

84.    At the same time, forest fires are a natural phenomenon, a necessary ecological process responsible for forest regeneration. Countless species of flora and fauna depend on wildfire.

85.    Because the 2020/2021 fires generally burned in a mosaic pattern, with varying degrees of intensity, there are varying degrees of fire-killed, living but partially burned, and living green trees within the fire footprints.

86.    In the Castle Fire, 21% of the area was unburned, 24% burned at low severity, 49% burned at moderate severity, and 6% burned at high severity.

87.    In the Windy Fire, 6% of the area was unburned, 33% burned at low severity, 33% burned at moderate severity, and 28% burned at high severity.

**Scoping**

88.    On January 26, 2021, the Forest Service released its scoping letter for a project titled the "Castle Fire Ecological Restoration Project," in which it proposed to take actions to reduce areas

of high fuels and create conditions for successful reforestation within the 2020 Castle Fire footprint.

89.     The Castle Fire Project's stated purpose is to restore and promote a healthy forest ecosystem in those areas where natural regeneration is unlikely, remove dead and dying trees, combined with restoration efforts, including planting and seeding, to re-establish healthy forest conditions that provide wildlife habitat with the goal of restoring conditions to be more resilient to drought, insect/disease outbreaks, and high-severity fire.

90.     The Project's stated need is to take action to restore healthy forest conditions in the areas burned by the Castle Fire, because, as stated, without specific management action, such as planting and seeding, native vegetation would be outcompeted by invasive plants. To contribute to the success of the restoration, as stated, site preparation, including the removal of dead and dying trees, and treatment of competing vegetation would need to occur, as the removal of the dead and dying trees would provide space for the planted trees, keep seedlings safe from falling trees, and ensure the safety of the forest workers. As stated, this would also help protect the remaining live trees, including giant sequoias, from falling dead trees and high-severity wildfire that could occur from fuel build-up if dead and dying trees were not removed.

91.     Plaintiffs submitted timely scoping comments. Plaintiffs, *inter alia*, objected to the Project's massive scope, suggested alternatives with less environmental impact, and requested that the Forest Service prepare an EIS because the proposed activities would result in significant adverse and cumulative effects on soils, wildlife, recreation, aquatic habitat, and carbon storage.

92.     In broad strokes, Plaintiffs requested detailed analysis to provide a basis for adequately balancing the trade-offs between cutting trees versus other important objectives such as wildlife habitat, carbon storage, climate change, and water quality.

93.     On September 2, 2022, the Forest Service released a proposal, titled the "Windy Fire Restoration Project," which proposed to use a combination of mechanical and hand treatments to fell and remove dead or severely affected trees within the 2021 Windy Fire footprint.

94.     The Windy Fire Project's stated purpose is to re-establish healthy and diverse forest conditions (including giant sequoia groves) that provide wildlife habitat for a diverse assemblage of species including special status species and old forest dependent species (Pacific fisher, California

COMPLAINT                                                                                              15

spotted owl and northern goshawk) and to restore ecological integrity, including carbon

sequestration, climate adaptability and hydrologic function of meadows, and provide safe access and

escape routes for forest visitors, residents, and firefighters along county roads 107 and Mtn. 50.

95.     The Windy Fire Project's stated need is to remove fire-killed trees that will begin

falling over and presenting a continuous source of fuel across the forest floor that would contribute

to high-severity wildfire. As stated, the Project is needed because in many of the areas where there

are no seed trees left, it is important to perform restoration and reforestation work in areas where

brush and invasive species might take over the site. Moreover, as stated, there are many dead or

dying trees associated with the drought in areas where the fire did not burn, or the fire burned at a

low severity, and the project is also needed to remove hazard trees adjacent to county roads 107 and

Mtn. 50 because as trees rot and become structurally weaker, they will begin to fall–with the

potential to land on or impede travelers on the roads.

96.     Again, Plaintiffs submitted timely scoping comments. Plaintiffs, *inter alia*, objected

to the Project's massive scope, suggested alternatives that would have fewer environmental impacts,

and requested that the Forest Service prepare an EIS because the proposed activities would result in

significant adverse and cumulative effects on soils, wildlife, recreation, aquatic habitat, carbon

storage, and more.

97.     In broad strokes, Plaintiffs suggested alternatives with less environmental impact and

requested detailed analysis to provide a basis for adequately balancing the trade-offs between cutting

trees versus other important objectives such as wildlife habitat, carbon storage, climate change, and

water quality.

**Limited Emergency Actions**

98.     On July 22, 2022, the Chief of the Forest Service signed a Decision Memorandum,

supported by a short three-page analysis, authorizing emergency actions to allow tree felling and

removal from 12 giant sequoia groves in the Sierra and Sequoia National Forests, some of which are

within the boundaries of the Castle and Windy Fire Projects.

99.     Although Plaintiffs expressed concern about using mechanical equipment within

sequoia groves and urged the Forest Service to limit the number of trees it would remove between 8

COMPLAINT                                                                                          16

and 20 inches diameters, Plaintiffs did not challenge these emergency actions in the GSNM due to their limited scope, which was to be confined to a small radius around the larger giant sequoias in each sequoia grove, and because the Forest Service told the public that they would use hand tools and leave most felled trees on site and away from larger giant sequoias in burn piles or scattered away from the larger trees.

**Preliminary Environmental Assessments**

100.   Rather than prepare an EIS for its actions, on January 31, 2023, the Forest Service released a Preliminary Environmental Assessment (EA) for the Castle Fire Project and provided notice to the public seeking comment.

101.   On March 2, 2023, Plaintiffs submitted timely comments on the Preliminary Castle Fire Project EA. Plaintiffs contended that this massively large logging/vegetation management project should receive greater scrutiny in an EIS due to its large size and scope, as well as its potential for significant direct, indirect, and cumulative effects to sensitive species and ESA-listed and proposed species.

102.   Plaintiffs again urged the Forest Service to consider reducing the size and scope of the project and its impacts on wildlife by studying a reasonable range of alternatives that would consider different treatments, remove only smaller diameter trees, and leave large dead trees (snags) on the landscape for wildlife habitat.

103.   Plaintiffs criticized the general and conclusory analysis of effects to wildlife, and asked that the Forest Service take a site-specific "hard look" at the direct, indirect, and cumulative effects of the proposal on these resources, as well as climate change, including the cumulative effects from its proposal and other actions that combine to adversely affect wildlife and their habitats.

104.   Similarly, rather than prepare an EIS, on March 21, 2023, the Forest Service released a Preliminary Environmental Assessment (EA) for the Windy Fire Project and provided notice to the public seeking comment.

105.   On April 21, 2023, Plaintiffs submitted timely comments on the Preliminary Windy Fire Project EA. Just as with the Castle Project, Plaintiffs contended that this massively large

COMPLAINT                                                                17

logging/vegetation management project should receive greater scrutiny in an EIS because of its large size and scope and the potential for significant direct, indirect, and cumulative effects to sensitive and ESA-listed and proposed species.

106.    Plaintiffs urged the Forest Service to reconsider reducing the size and scope of the project and its impacts on wildlife by studying a reasonable range of alternatives that would consider different treatments, remove only smaller diameter trees, and leave large dead trees (snags) on the landscape for wildlife habitat.

107.    Plaintiffs again criticized the general and conclusory analysis of effects to wildlife, and asked that the Forest Service to again take a site-specific "hard look" at the direct, indirect, and cumulative effects of the proposal on these resources, as well as climate change, including cumulative effects from its proposal and other actions, which combine to adversely affect wildlife and their habitats.

**The Administrative Objection Process**

108.    On May 19, 2023, the Forest Service initiated the pre-decisional administrative objection process for the Castle Project. This process affords stakeholders who participated in earlier stages of the administrative process the opportunity to engage with the Forest Service to resolve key issues prior to a final decision. *See generally* 36 C.F.R. Part 218.

109.    Along with the initiation of that process, the Forest Service released a draft Decision Notice and FONSI for the Castle Fire Project, and Plaintiffs submitted their timely objection on June 22, 2023.

110.    Plaintiffs averred that their concerns were not sufficiently addressed in the EA, FONSI, and draft Decision Notice for the Castle Fire Project in response to their extensive comments, which were reviewed by the same Forest Service personnel who crafted the environmental analyses.

111.    The objection covered a range of topics including the tree diameter limits imposed by the forest plan and failure to take a hard look at the Project's impacts to listed wildlife species and carbon storage. Objectors also raised concerns about the range of alternatives considered and flagged the need for an EIS.

COMPLAINT                                                                                          18

112.     On August 4, 2023, the Forest Service initiated the pre-decisional administrative objection process for the Windy Project. Along with the initiation of that process, the Forest Service also released a draft Decision Notice, FONSI, and EA for the Windy Fire Project.

113.     During the objection process for the Castle and Windy Fire Projects and before the Windy Fire Project objection was due, Plaintiffs learned that a pack of gray wolves, an endangered species, had moved into the Castle and Windy Project areas.

114.     On August 15, 2023, Plaintiffs submitted a letter to the Forest Service raising concerns about this significant new information, asserting the need to analyze the cumulative impacts of the Projects and other logging projects on the new gray wolf pack, the need for ESA consultation with USFWS, as well as the need for supplementing the Projects' NEPA analyses to consider the potential effects from the proposed actions on this endangered species.

115.     Plaintiffs' letter listed the various projects that could potentially impact the wolves, including ongoing hazard tree logging, the emergency actions in sequoia groves, as well as other projects planned within the range of where the wolves would likely roam, including proposed logging on the Tule River Indian Reservation and throughout the Greenhorn Mountains of the Sequoia National Forest. Plaintiffs further noted that the Forest Service's supplemental analysis must disclose potential disturbances from activities associated with the ongoing and proposed Project actions that could lead to behavioral alterations of prey species such as fleeing or displacement. Plaintiffs also noted that direct causes of wolf mortality, which include starvation, disease, intraspecific aggression, interspecific conflicts, accidents, and human-related events such as illegal poaching and vehicle collisions, must be considered and analyzed in the cumulative effects analyses.

116.     On September 12, 2023, the Forest Service responded with a letter, acknowledging that it has obligations under the Endangered Species Act and National Environmental Policy Act to review the new information about the presence of wolves in Project areas.

117.     On the same day, the Forest Service issued its response to Plaintiffs' objection of the Castle Project. With the exception of an instruction to clarify how the project may comply with the GSNM Plan regarding the diameter limits outlined in Table 46 of the GSNM Plan, the administrative review process affirmed the Castle Fire Project analysis and dismissed Plaintiffs' primary concerns.

COMPLAINT                                                                                    19

118.    On September 15, 2023, Plaintiffs filed their timely objection of the Windy Fire Project, in which Plaintiffs raised the same issues as they had with the Castle Project, and added a new claim based on the significant new information that wolves were now roaming in the Castle and Windy Fire areas and that the Forest Service needed to supplement its analyses.

119.    In both the Castle and Windy Project objections, Plaintiffs raised all issues detailed as claims in this case. The exhaustion of these issues is also reflected in the Forest Service's objection responses and objection review summaries.

120.    On November 8, 2023, the Forest Service issued its response to Plaintiffs' Windy Project objection. With the exception of an instruction to determine whether the new information associated with the newly discovered gray wolf pack in Tulare County warrants a supplement to the EA and to document the findings in the project record, the administrative review process affirmed the Windy Fire Project analysis and dismissed Plaintiffs' primary concerns.

121.    In filing scoping comments, commenting on both Preliminary EAs, and filing administrative objections, Plaintiffs have exhausted all of their administrative remedies, and this case is ripe for judicial review.

**Final EAs, FONSIs, and Decision Notices**

122.    On December 28, 2023, the Forest Service released its final EAs and FONSIs, along with its final Decision Notices for both Projects.

123.    The Forest Service's final Project EAs retained the same purpose and need statements and the same proposed action statements as those provided in the preliminary EAs.

124.    Moreover, the Forest Service did not enlarge their consideration of additional alternatives, and like the preliminary EA, it only considered the no-action and proposed-action alternatives.

125.    The Forest Service bases for rejection of alternatives fall into three categories: 1) that restoration and reforestation cannot be accomplished without the felling and removal of dead trees, 2) that reduction of fire risks within the wildland-urban interface threat zone cannot be accomplished without removing larger live trees, and 3) that treatment of smaller portions of the proposed action area would not accomplish the Projects' goals.

126.    As reflected in the purpose and need statement and alternatives dismissed from detailed consideration, the Forest Service preemptively made a policy choice to take an over-inclusive approach to implement its version of ecological restoration, precluding the consideration of other resource values that would have yielded a more narrowly tailored approach.

**Design Features as Mitigation Measures to Reduce Significant Effects**

127.    The Projects rely on a comprehensive set of "design features" to ostensibly eliminate or minimize the effects of tree removal and attendant operations below the level of "significance."

128.    The Forest Service's EAs and FONSIs rely on these design features, also known as mitigation measures, to avoid preparation of NEPA-mandated EISs.

129.    The design features were developed for air, aquatic wildlife, terrestrial wildlife, botany, invasive plants, heritage resources, transportation, public health and safety, range, recreation, public use, soils, watersheds, water resources, vegetation, fuels, and giant sequoias.

130.    In total, each Project relies on dozens of specific design features in addition to a series of best management practices and other applicable criteria, also referring to plan standards and guidelines. Relying on design features to minimize or eliminate effects or reduce the significance of impacts for Projects of this scale in the GSNM is unprecedented.

131.    The Final EAs provide no assessment of the potential efficacy of the design features. There is no monitoring plan in place to assess whether the design features are effective, and no contingency plan for design features that prove ineffective.

**Findings of No Significant Impact**

132.    The Castle EA contains a brief Finding of No Significant Impact (FONSI), whereas the FONSI for the Windy Project is contained in its Final Decision Notice.

133.    Both FONSIs state that the Forest Service considered both short- and long-term effects and identified no significant effects, but provide no supporting rationale and instead refer to the EAs' analysis sections.

134.    The FONSIs also state that the Forest Service considered both beneficial and adverse effects and identified no significant effects, but provide no supporting rationale and instead refer to the EA's analysis sections and Project design features. The FONSIs state that the Projects would

COMPLAINT                                                                                      21

cause adverse impacts, but also provide beneficial long-term impacts by moving the fire areas towards meeting desired conditions. They do not say whether any such impacts would be significant.

135.    The FONSIs also state that the Forest Service considered the effects of the proposed actions on public health and safety. The FONSIs state that the removal of dead trees would reduce future fuel loads but increase smoke from prescribed burning, and reduce tree hazards but increase risk to firefighters. The FONSIs do not explain why such effects are not significant.

**Final Decision Notices**

136.    The Forest Service issued Final Decision Notices ("DNs") for each of the project on December 28, 2023. The DNs were signed by Forest Supervisor Teresa Benson—now retired.

137.    Each of the Final DNs adopt their respective EAs and FONSIs and select the Proposed Action. Each of the Final DNs states they considered other alternatives, but selected the proposed action because other alternatives did not meet the purpose and need of the project.

138.    The Final DNs largely share the same boilerplate language.

139.    Rather than supplement or update its final EAs to analyze the Projects' potential impacts on the newly-discovered wolf pack, each DN contains a section that describes the Forest Service's consultation process with USFWS and includes a statement asserting that supplementation of the EAs was unnecessary, because:

> The discovery of a gray wolf pack did not significantly alter the circumstances or the impacts of this project, nor did it cause a substantial change. While some project design features have been added, the project treatments and expected effects are the same as those evaluated in the original NEPA documentation.

(Castle DN, p. 9, Windy DN, p. 8).

140.    Each of the Final DNs recognizes the potential for negative short-term effects to the various impacted resources, but emphasizes applicable design features to reduce effects below the level of "significance."

141.    Tree felling, removal, and logging operations can now begin immediately across both project areas, and the Forest Service plans to begin implementation in the spring of 2024. There will be no further analysis or decisionmaking.

///

COMPLAINT                                                                                                    22

**Giant Sequoia Groves, Proposed Wilderness, and Inventoried Roadless Areas**

142.   The Castle Project includes 4,979 acres of dead tree removal; 2,902 acres of mechanical fuels reduction treatments that include thinning stands from below; 2,056 acres of managed fire; and 11,362 acres of reforestation with additional site preparation as needed. The Forest Service also will complete an estimated 37,279 acres of hand-prepped prescribed burning along with the treatments described above.

143.   The Windy project includes 16,977 acres of restoration activities within the 75,382 acres of national forest lands burned in the Windy Fire, with roughly 2,000 acres located outside the GSNM, in the SNF. Treatments include the implementation of fuels reduction (4,278 ac), hazard tree abatement (1,224 ac), reforestation (10,517 ac) meadows restoration (521 ac) and 437 acres of overlapping treatment types.

144.   Collectively, these Projects authorize the felling and removal of trees from over 13,000 acres of forestlands, mostly in the GSNM, but also in the SNF.

145.   Project activities include the felling and removal of trees from Giant Sequoia Groves, as well as other vegetation management actions beyond those authorized in the Emergency Actions Decision Memorandum issued by the Chief of the Forest Service.

146.   The Castle Project authorizes various vegetation management actions in a number of Giant Sequoia Groves, including Alder Creek, Mountain Home, Belknap Complex, Burro Creek, Dillonwood, Freeman, Middle Tule, Silver Creek, and Wishon.

147.   Proposed treatments in the Giant Sequoia Groves in the Castle Project include 106 acres of dead tree removal, 106 acres of mechanical fuels treatment, 1,530 acres of managed wildfire, 8,343 acres of prescribed burning with hand prep, and 983 acres of tree planting.

148.   The Castle Project avoids activities in the Golden Trout Wilderness, but allows managed wildfire in the Proposed Moses Mountain Wilderness, as well as fuel treatments and prescribed burning in the Slate Mountain Inventoried Roadless Area (IRA), the Moses Mountain IRA (outside the proposed Wilderness), the Dennison Peak IRA, and the Rincon IRA.

149.   The Windy Project authorizes various vegetation management actions in a number of Giant Sequoia Groves, including Black Mountain, Redhill, Peyrone, South Peyrone, Long Meadow,

Starvation Complex, Powderhorn Tree/Packsaddle, and Deer Creek.

150.     Proposed treatments in Giant Sequoia Groves in the Windy Project cover 900 acres and include dead tree (snag) removal, hazard tree abatement, fuel reduction, and reforestation through planting.

151.     Plaintiffs aver that the size and scope of the Projects is unprecedented in the GSNM, and they are the largest logging and vegetation management projects proposed by the Forest Service in the GSNM since President Clinton created it.

**Threatened and Endangered Species in the Project Area**

152.     The Project areas contains important habitat for proposed, threatened, endangered, and Forest Service sensitive species. The Projects "may affect" dozens of proposed, threatened, endangered, or sensitive fish, wildlife, and plant species.

153.     Proposed, threatened, and endangered species are species protected (or proposed for protection) under the ESA and are defined as those species in danger of extinction throughout all or a significant portion of their range, or those likely to become so within the foreseeable future. Each Project area contains designated or proposed critical habitat for several ESA-listed species.

154.     Sensitive species are those plant or animal species which are susceptible or vulnerable to activity impacts or habitat alterations that are recognized by the Regional Forester as needing special management to prevent placement on Federal or State ESA lists.

155.     The Project areas provide habitat for numerous threatened, endangered, or sensitive fish and wildlife species, including Pacific fishers (endangered), gray wolves (endangered), California spotted owls (proposed for listing as threatened), California condors (threatened), Little Kern golden trout (threatened), and mountain yellow-legged frogs (endangered).

156.     The Project areas are also home to numerous proposed, threatened, endangered, or sensitive plant species. Although the Windy Project biological evaluations lists a number of rare plant species, it does not provide information as to whether any are proposed, threatened, endangered or sensitive.

157.     Some of these species rely on the unique habitat conditions created by fires. Large trees that are dead and dying, including those in the Project area, provide valuable habitat for a wide

COMPLAINT                                                                                          24

variety of wildlife that rely on dead wood in the forest.

158.    Post-fire habitats are inherently fragile. Post-fire logging activities, including dead and hazard tree removal operations, can cause habitat modification and destruction, soil compaction, and degradation of water quality. The effects of such activities are additive to the effects of the fires themselves. Many species can adapt to and in some cases, select for burned habitat, but avoid areas that have burned and then logged.

159.    Pacific fishers require moderate to dense forest canopy cover for denning/resting habitat and avoid non-forested habitats with little or no cover. They prefer habitat with an abundance of complex forest structural components such as trees with cavities, large down logs, and large snags (standing dead trees). Larger trees that have burned in a wildfire provide valuable cavities and crevices for fisher dens.

160.    Logging of live and standing dead trees (snags), thinning, and other treatments that change forest structure or canopy cover degrade habitat for Pacific fishers. Scientific studies have found that fishers avoid using logged areas when denning, resting, and foraging.

161.    In the Southern Sierras, Pacific fishers are listed as endangered under the ESA. Estimates of the endangered Southern Sierra Nevada (SSN) fisher population before the recent severe drought and fires in the Sierra and Sequoia National Forests range from 100 to 500 individual fishers, including one estimate of 300 individuals, although other estimates have found only 50 to 120 reproductive adult females in that same population. The Sequoia and Sierra National Forests provide habitat for the world's southernmost population of Pacific fishers.

162.    Any changes in the fisher population after recent droughts and wildfires are unknown due to a complete lack of SSN fisher population surveys.

163.    The Projects would adversely affect habitat for the SSN fisher at an elevation band of 3,500 feet to 8,000 feet.

164.    Both EAs conclude that the Projects may affect, but are not likely to adversely affect (MANLAA), the SSN fisher, principally on account of the Project design features.

165.    The EAs also conclude that the Projects may affect, but are not likely to adversely affect (MANLAA), a series of other ESA-listed species and their critical habitat, including the

COMPLAINT                                                                                                          25

Pacific fisher, the mountain yellow-legged frog, and the Little Kern golden trout, despite these species' presence in the Project area and likelihood of disturbance from Project activities. The Forest Service summarily labeled the Project's effects "temporary," citing Project design features.

166.    To protect known and potential fisher den clusters from disturbance, the Forest Service imposes a limited operating period (LOP) from March 1 through May 1 for prescribed fire or burning, and from March 1 through June 30 for other disturbance-producing vegetation treatments.

167.    For these threatened and endangered wildlife species, the Forest Service engaged in ESA Section 7 consultation over the Projects' impacts to ESA-listed species. The USFWS concurred with the Forest Service's may affect, not likely to adversely affect (MANLAA) determinations.

**The Newly-Identified Wolf Pack**

168.    On August 11, 2023, California Department of Fish and Wildlife ("CDFW") confirmed the existence of a wolf pack after investigating multiple reports of wolf activity on the GSNM and SNF. The wolves roam within the area of the Giant Sequoia Emergency Response project, as well as the Windy and Castle Project areas.

169.    CDFW initially reported a mother wolf and four pups. They subsequently identified a father wolf and two additional pups for a total of eight (8) wolves comprising what CDFW and the Tule River Indian Reservation now refer to as the "Yowlumni Wolf Pack."

170.    Wolves are habitat generalists. They can fulfill their breeding, foraging, and dispersal needs over a wide range of habitat conditions, adapting to differences in the environment and exhibiting different patterns of habitat selection based on the time (year, season, time of the day) and areas observed. Prey availability is a key factor influencing wolf distribution and abundance.

171.    Wolves typically hunt within their territory (which can range from 20 square miles up up to 1,500 square miles in areas where prey is scarce) and may cover approximately thirty miles in a day in a hunting foray. Denning wolves and wolf pups are most vulnerable to disturbance when pups are young, resulting in the potential for interrupting pup feedings, abandonment of pups, and failed attempts to move relatively immobile pups.

172.    Wolves are born in dens in April or May. Pups emerge from their dens at 3 to 4 weeks of age and remain at the den site for approximately 6 weeks until they are weaned. Thereafter,

they transition to rendezvous sites, which are simply above-ground dens. The wolf pack typically uses these sites from mid-May to mid-October, often having multiple rendezvous sites within their home range. When pups are 7 to 8 months old, or fully grown, they begin traveling with adults on their hunting circuits.

173.    Dead tree removal, fuel reduction treatments, prescribed burning, and site preparation for planting directly affects the availability of the wolves' prey (typically deer). Noise and other disturbance from operation of heavy machinery, chainsaws, or other vehicles during treatment activities could cause displacement of gray wolves from their dens, rendezvous sites, or foraging areas. Other potential threats to wolves include pesticides, being hit by vehicles traveling on roads, lethal control of wolves in response to livestock depredation, snowmobiles and off-highway vehicles, domestic dogs and associated diseases, and cumulative effects from other projects and activities on private lands or other vegetation management projects.

174.    To minimize impacts to the wolves from Project activities, USFWS requires a buffer with a mile radius from a known active den or rendezvous site. USFWS imposes a limited operating period in the buffer zone, and all noise or smoke-generating activities related to vegetation management projects within the buffer zone are forbidden between April 1 through July 15.

175.    CDFW captured and placed a radio collar on the mother wolf to track the pack's location and identify den and rendezvous sites. The Forest Service is required to consult with CDFW throughout project implementation regarding the latest known location information about the wolves.

176.    With respect to the wolves, the Forest Service re-initiated ESA Section 7 consultation over the Projects' impacts. The USFWS concurred with the Forest Service's may affect, not likely to adversely affect (MANLAA) determination.

177.    Although the Forest Service prepared an Addendum to its Biological Assessment for the newly-identified gray wolf pack, it did not supplement its EAs to consider the potential direct, indirect, and cumulative effects on the wolf pack.

**Species Proposed for Listing and Sensitive Species**

178.    For the dozens of designated sensitive wildlife and plant species in the Project area,

the Forest Service concluded that the Project may impact individuals or habitat, but will not likely contribute to a trend toward Federal listing or a loss of viability to the population or species. For these determinations, the Forest Service relied principally on the Project design features.

179.    California spotted owls and northern goshawk are proposed or sensitive species present in both Project areas.

180.    The USFWS has recently proposed listing the California spotted owl as threatened in the Sierra Nevada and as endangered in the four Southern California National Forests.

181.    Like its cousins, the Mexican and northern spotted owls, the California spotted owl is a bellwether of old-growth forests. The California spotted owl is closely associated with habitat similar to that of the Pacific fisher. The Project areas overlaps many California spotted owl protected activity centers and home range core areas.

182.    Habitat destruction or degradation from logging activities continues to pose a significant ongoing threat to the California spotted owl. Research findings have consistently documented a correlation between mechanical reductions in canopy cover, as well as removal of snags, as adverse effects to California spotted owls.

183.    According to the Forest Service, the felling of trees and snags of all sizes, ages, and decay classes in various fire severities has inherent risks to any California spotted owl that may be occupying the area and using the trees. This is particularly true if the trees occur in suitable habitat and/or in an area of increased use by California spotted owls such as a protected activity center, home range core area, or core use area.

184.    Goshawk habitat in the Project area consists of mature conifer and deciduous forest with large trees, snags, downed logs and dense canopy cover for nesting, as well as more open habitats for foraging such as meadows, brush patches, and riparian areas. Goshawks will abandon territories with high amounts of canopy loss.

185.    According to the Forest Service, the felling of trees and snags of all sizes, ages, and decay classes in various fire severities has inherent risks to goshawks that may be occupying the area and using trees for nesting, roosting, and denning.

186.    The Forest Service discounted the Projects' effects on California spotted owl and

COMPLAINT                                                                                    28

northern goshawk on account of Project design criteria, which apply limited operating periods (LOPs) to areas within a quarter-mile of nests or protected activity centers between March 1 and August 15 for California spotted owls and between February 15 and September 15 for northern goshawks.

187.   The effects of the Project on ESA-listed and sensitive wildlife species—and the countless other undesignated species in the Project area—are cumulative to the effects other post-fire logging operations (and other activities) on Federal, State, and private lands within the fire footprints.

188.   Each EA provides a list of current and future activities within and adjacent to each Project. Each EA states that the effects of these activities were "considered," but provides no discussion of how such effects, combined with the Projects' effects, may affect Project area resources.

189.   The EAs provide no site-specific information about any of the proposed, threatened, endangered, or sensitive species and instead relies on generalized conclusions. There is no geographic detail about the location of habitat areas that support critical life cycle functions such as denning and roosting sites or other biologically critical areas. There is no analysis of the effects of any specific tree removal or vegetation treatment area on wildlife species, including whether such operations may impact critical habitat components.

**Dead Tree Removal for Ecological Restoration and Snag Wildlife Habitat Analysis**

190.   While the GSNM Plan limits removal of trees to 20 inches in diameter, the Castle Project would log dead or fire-killed trees up to 30 inches in diameter in the Castle Fire area and fire-killed trees without any upper diameter limit in the Windy Project area for the purpose of ecological restoration.

191.   The Forest Service has asserted that these limits apply only to live or green trees. The GSNM Plan, its standards, and Table 46 are silent with regard to whether the limit excludes dead trees (snags).

192.   In its *post hoc* interpretation of these Plan standards, the Forest Service admits that:

COMPLAINT                                                                            29

No reference is made in Table 46 regarding snags. The GSNM Plan does not provide specific management direction for post-fire ecological restoration, except for a wildlife habitat standard and guideline which describes the need to manage snags for ecological restoration objectives in areas burned by wildfire ....

193.    That snag management standard after wildfire, however, is intended primarily to benefit wildlife habitat, and states, in full:

In areas burned by wildfire, including high- and mid-severity patches, manage snag levels to meet ecological restoration objectives, *with consideration for the spatial arrangement and density of snags for wildlife needs. Include site-specific considerations such as a wider range of snag sizes and densities, and focal placement of snags and snag patches.*

194.    The section does not reference diameter limits for tree felling and removal. Moreover, the Forest Service has included no site-specific prescriptions in its dead tree removal areas that snag levels are to be managed for "wildlife needs." There is no discussion or analysis in the EAs that, in removing snags, the Forest Service has considered "a wider range of snag sizes and focal placement of snags and snag patches" for wildlife.

195.    Moreover, the wildlife habitat standard does not explicitly negate and is not inconsistent with the Plan requirement in Table 46 to limit tree removal to 20 inches in diameter. Leaving more of the large snags is consistent with ecological restoration and benefits species like black-backed woodpeckers. Instead, the stated reason for removing snags is not for "wildlife needs," but to reduce fuels and prepare the area for planting seedlings.

196.    In its reasoning to interpret that snags are not included in the tree diameter limit, the Forest Service cites no Plan standard or guideline, but instead suggests a that "analysis provided in the GSNM Plan FEIS indicates that medium (15-30" dbh) and large snags (> 30" dbh) could be removed for safety and ecological restoration (GSNM Plan FEIS, Vol. 1, p. 446 and 502)."

197.    In its project analysis for Pacific fisher, however, the Forest Service has defined large snags as standing dead trees over 15 inches in diameter at breast height.

198.    The GSNM Plan has allocated the vast majority of both Project areas to the Old Forest Emphasis Area land allocation.

199.    There, as it relates to "**Abundance of Snags in Burned Forest,**" the GSNM Plan FEIS, p. 446 states more fully in comparing alternatives, with Alternative B chosen as the plan:

**Alternative A:** In Alternative A, the 2001 [Sierra Nevada Forest Plan Amendment] SNFPA standards and guidelines would be followed. This prohibits salvage of snags on at least 10 percent of an area following a stand-replacing event. This restriction does not apply to [Wildland/Urban Interface] WUI defense zones (13 percent of the Monument). *In old forest emphasis areas (46 percent of the Monument) all snags 15 inches or greater would be retained following stand-replacing events except to address imminent hazards to human safety.*

**Alternatives B, C, and F:** In Alternatives B, C, and F, snags would only be removed from burned forests for safety reasons or ecological restoration. This could potentially reduce the number of medium and large snags per acre in the affected area. The change in the number of available snags would be based on a project-level, site specific decision. ***More snags in burned forest would be expected across the landscape than in Alternatives A*** and E.

(Bold in original; italics and bold/italics for emphasis; <u>**Alternative B is the selected alternative**</u>).

200. As it relates to "**Snags in Burned Forest Ecosystem Component (Black-backed Woodpecker)**" the GSNM Plan FEIS, p. 501-502 states more fully:

**Alternative A**
In Alternative A, the 2001 SNFPA standards and guidelines would be followed. This prohibits salvage of snags on at least 10 percent of an area following a stand-replacing event. This restriction does not apply to WUI defense zones. In old forest emphasis areas (46 percent of the Monument) *all snags 15 inches dbh or greater would be retained following stand-replacing events except to address imminent hazards to human safety.*

**Cumulative Effects Conclusion**
The indirect and cumulative effects of Alternative A is expected to result in: (1) a possible reduction in medium (15-30 inches dbh) snags per acre within burned forest created by stand-replacing fire if snags are removed (2) a possible reduction in large (greater than 30 inches dbh) snags per acre within burned forest created by stand-replacing fire if snags are removed.

**Alternatives B, C, and F**
In these alternatives, snags would only be removed from burned forests for safety reasons or ecological restoration. This could potentially reduce the number of medium and large snags per acre in the affected area. The change in number of available snags would depend on the size and specific location of the burned area. Snags near roads, campgrounds, and administrative facilities would more likely be removed.

The SPECTRUM model estimated that management following Alternative C would likely result in more acres of stand-replacing fire than all of the alternatives, except Alternative D.

COMPLAINT                                                                    31

**Cumulative Effects Conclusion**
The indirect and cumulative effects of Alternatives B, C, and F is expected to result in: (1) a possible reduction in medium (15-30 inches dbh) snags per acre within burned forest habitat created by stand-replacing fire if snags are removed for safety reasons or for ecological restoration; (2) a possible reduction in large (greater than 30 inches dbh) snags per acre within burned forest habitat created by stand-replacing fire if snags are removed for safety reasons or ecological restoration.

(Bold in original, italics for emphasis; **Alternative B is the selected alternative**)

201.    While there are now hundreds of snags per acre that benefit wildlife, in areas where the Castle and Windy Fires burned at high severity, the Projects would, within tree removal areas, retain only an average of 4 of the largest snags over 12 inches dbh for wildlife habitat.

## CLAIMS FOR RELIEF

### National Environmental Policy Act (NEPA) Violations

202.    The paragraphs above are incorporated herein by reference.

**Count 1:**    **Reliance on an Unreasonably Narrow Purpose and Need and Failure to Analyze a Reasonable Range of Alternatives**

203.    NEPA requires an agency to study, develop, and describe appropriate alternatives. The existence of a viable, but unexamined, alternative renders an EA inadequate.

204.    Because the range of alternatives an agency must consider need not extend beyond those reasonably related to the purpose and need of the project, the agency may not define its objectives in unreasonably narrow terms.

205.    In both Projects, the Forest Service only considered "no action" and its "proposed action" alternatives.

206.    The Forest Service impermissibly defined the purpose and need of each Project so narrowly that only the proposed action would achieve the Forest Service's objectives.

207.    The Forest Service used the GSNM Plan's decision tree to eliminate the possibility that restoration without tree removal would be considered, stating that it would not meet the purpose and need for ecological restoration. It then impermissibly narrowed its purpose and need further by stating that any action must also be consistent with its General Technical Report, titled "*GTR-270 Postfire Restoration Framework*," (GTR) its "*Post-fire Restoration Strategy for the 2021 Windy*

*Fire, KNP Complex, and French Fire*" (Strategy), and a Memorandum of Understanding with the State of California (MOU), making it impossible for any other action alternatives to meet its stated purpose and need.

208.   The Forest Service dismissed from detailed consideration other alternatives that were reasonable but for the agency's narrowly drawn purpose and need statement. Even if the purpose and need statement was reasonable, the range of alternatives did not satisfy NEPA.

209.   Commenters raised a series of reasonable alternatives for both Projects that would reduce the size and scope of its impacts on wildlife, consider different treatments as envisioned in the GSNM Decision Tree, remove only smaller diameter trees, and leave large dead trees (snags) on the landscape for wildlife habitat.

210.   The Forest Service, however, made a front-end policy choice that pre-determined its logging approach. This approach trumped all other values and dismissed reasonable alternatives. Under NEPA, however, such a policy choice can only be made *after* consideration of reasonable alternatives.

211.   The Forest Service's pre-determined restoration objectives derive from applying the GSNM Decision Tree prior to the analysis, first to eliminate possible alternatives, and then to cement its approach by defining the purpose and need so narrowly that any action must be consistent with its GTR, Strategy, and MOU.

212.   In effect, the analyses "tier" to these documents, and the agency in the Project EAs failed to independently evaluate the impacts from following these documents, and simply adopted the actions and provisions described in its GTR, Strategy, and MOU.

213.   But these documents have never been analyzed in accordance with NEPA's procedural safeguards. Therefore tiering to these documents to set standards for tree removal and to limit the range of alternatives violates NEPA.

214.   The Forest Service's manufacture of an unreasonably narrow purpose and need, failure to consider a reasonable range of alternatives, and reliance on non-NEPA documents violates NEPA and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of, procedure required by law.

COMPLAINT                                                                                      33

**Count 2:**     **Failure to Analyze and Disclose the Project's Direct, Indirect, and Cumulative Impacts**

215.     NEPA requires an agency to analyze and disclose the direct, indirect, and cumulative effects of a proposed action.

216.     Agency analysis must satisfy NEPA's "hard look" requirement, closely examining the proposed project's potential effects. The agency may not rely on incorrect assumptions or data; it must provide quantified or detailed information. Absent justification for failure to provide definitive information, general statements about possible effects and the existence of some risk do not constitute a hard look.

217.     To fulfill NEPA's public disclosure requirements, the agency must provide the public with the underlying environmental data from which the agency developed its opinions and arrived at its decisions.

218.     An EA must provide sufficient evidence and analysis, including disclosure and consideration of the environmental impacts of a proposed action and alternatives, to determine whether to prepare an EIS or a FONSI.

219.     An agency's analytical obligations under NEPA are dictated by the underlying requirements derived from substantive statutes like NMFA and the ESA.

220.     Even for large-scale projects, NEPA requires a detailed evaluation of site-specific impacts once the agency has made the critical decision to act. Here, that threshold was crossed when the Forest Service issued the final EAs, FONSIs, and DNs for the Projects. The decision to authorize thousands of acres of logging operations, albeit without sufficiently detailed and site-specific analysis to support the decision in the spirit of NEPA's twin aims of public involvement and informed decisionmaking, is final and will not be revisited.

221.     The Forest Service failed to properly analyze and disclose the Project's direct, indirect, and cumulative effects on special status species, which are additive to the environmental baseline.

222.     The Forest Service's EAs fail to analyze the Projects' effects on gray wolves, protected under the ESA, which made their home in the Project areas during the project planning

COMPLAINT                                                                                    34

processes and before the decision to proceed. In addition, the EAs fail to discuss any site-specific effects from activities on known habitat areas for species listed as sensitive, threatened, endangered, as well as those proposed for ESA-listing, and instead offer conclusory statements that minimize wildlife concerns and adverse effects to habitat.

223.    Rather than take a hard look at the Project's direct, indirect, and cumulative impacts, the Forest Service fell back on the Project's design features to allegedly minimize or eliminate effects. But the EA contains no evaluation of the efficacy of the design features, especially when implemented across the huge scale of the Project areas.

224.    Moreover, studies provided by Plaintiffs show that post-fire logging of dead trees, as proposed, would likely kill much of the natural post-fire sequoia and other conifer seedling reproduction. Again, the Forest Service failed to discuss or analyze these likely effects, even though its own studies found that over 70% of natural post-fire conifer regeneration was killed by ground-based post-fire logging in the Rim Fire area. Further, the Forest Service failed to respond to a large and growing body of scientific evidence, that post-fire logging makes wildfires spread faster, burn more severely, and puts nearby communities at greater risk.

225.    The Forest Service also failed to provide any quantified or detailed information about cumulative effects. The agency listed an incomplete selection of current and reasonably foreseeable future projects, but did not analyze the combined and synergistic impacts of the Project and multiple post-fire and other projects on overlapping and adjacent Federal, State, and private lands.

226.    As an example, Plaintiffs pointed out that a large post-fire logging project was planned for the Tule River Indian Reservation in the same footprint as the Windy Fire, yet there was no mention of this project or any quantified or detailed information about it or other projects on the various sensitive resources affected by the cumulative logging and tree removal actions.

227.    As another example, although the Windy Fire burned almost three years ago, the Forest Service concludes, based simply on early observation, that the presence of any rare plant species within the Project area is considered unlikely due to the significant disturbance to and widespread mortality of the vegetative forest understory and meadow communities entirely burned by the fire. It states that current occupancy of the Project area by a list of rare plant species is

considered unlikely, but illogically concludes that the proposed action should result in general improvements to the same plants' habitat conditions and suitability throughout the Project area.

228.    The Forest Service's failure to properly analyze and disclose the Project's direct, indirect, and cumulative effects violates NEPA and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of, procedure required by law.

**Count 3:**        **Failure to Prepare an EIS**

229.    Under NEPA, federal agencies must prepare an EIS for major Federal actions that significantly affect the quality of the human environment.

230.    In assessing the question of "significance," the agency should consider the potentially affected environment including resources such as ESA-listed species, as well as the degree of effects including short- and long-term effects and beneficial and adverse effects.

231.    NEPA requires that an agency prepare an EIS if "substantial questions" are raised as to whether its decision may cause significant degradation of some human environmental factor.

232.    An agency's decision not to prepare an EIS must be fully-informed and well-considered, supported by a convincing statement of reasons why the actions are not significant.

233.    In lieu of EISs for the Projects, the Forest Service prepared boilerplate EAs and FONSIs that relied on project design features to assert that all effects would be insignificant.

234.    Substantial questions exist about the potentially significant effects of a combined 13,000 acres of logging, the largest Projects in the GSNM since its creation.

235.    The Project would impact countless resources, including hundreds of species, among them numerous ESA-listed, proposed, and Forest Service sensitive species.

236.    The Forest Service declined to select the "no action" alternative, asserting instead that implementation of its selected alternative would yield positive benefits, especially in terms of restoration. To the extent such benefits are "significant," an EIS is required. If, however, the benefits are not significant, this provides evidence that the Forest Service's dismissal of other reasonable alternatives was arbitrary and capricious.

237.    Neither of the EAs and FONSIs contain a convincing statement of reasons why the potential impacts of the Projects are insignificant.

238.    The effects of the Project are inherently uncertain, given the Project scale, unverified application of the subjective GTR, Strategy, and MOU, and reliance on Project design features or other mitigation measures and best management practices whose efficacy has not been analyzed.

239.    To the extent the Forest Service split the adjacent Projects into smaller component parts to avoid a finding of significance and preparation of an EIS, such segmentation is impermissible under NEPA.

240.    The Forest Service's failure to prepare an EIS—or multiple EISs—for the Projects violates NEPA and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of, procedure required by law.

**National Forest Management Act (NFMA) Violations**

241.    The paragraphs above are incorporated herein by reference.

**Count 1:**        **Failure to Comply with the Tree Diameter Limits in the GSNM Forest Plan**

242.    The National Forest Management Act requires that each site-specific project, resource plan, permit, contract, and other instrument for the use and occupancy of National Forest System lands shall be consistent with the governing forest plan. 16 U.S.C. § 1604(i). Accordingly, because the vast majority of the Castle and Windy Project areas are in the GSNM, the Forest Service's resource plan for those Projects must comply with the 2012 GSNM Plan.

243.    The GSNM Plan includes a decision tree that requires the Forest Service to first consider managed wildfire, prescribed fire, and mechanical treatments without tree removal for ecological restoration. Treatments with tree removal can only be considered if other methods do not meet the ecological objectives in the project purpose and need.

244.    The GSNM Plan further requires that "[a]ny treatments that involve the removal of trees from within the Monument area, including both standing trees and downed logs, will only be permitted following a determination that removal of the trees is 'clearly needed for ecological restoration and maintenance or public safety' (Clinton 2000, p. 24097)."

245.    The GSNM Plan includes a Monument-wide standard for "Vegetation, including Giant Sequoias," which states: "When implementing vegetation and fuels treatments, retain all conifer trees with a dbh of 20 inches or greater in westside forest types. Retain montane hardwoods

with a dbh of 12 inches or larger in westside forest types."

246.    Table 46 of the GSNM Plan provides management direction for ecological restoration by specifying tree diameter limits in various land allocations or species habitats in the GSNM, limiting tree cutting and removal to 20 inches in diameter; with additional 12 inch diameter limits for giant sequoias and hardwoods; 6 inch diameter limits within 1-2 acres of California spotted owl and northern goshawk nest trees; and complete avoidance of tree cutting in carnivore den sites outside wildland urban interface defense zones.

247.    Neither standard in the two previous paragraphs make any distinction between live or dead trees (snags). Moreover, the GSNM Plan only makes exceptions for removing dead trees to avert hazards for public safety, not for ecological restoration.

248.    The GSNM Plan has allocated the vast majority of both Project areas to the Old Forest Emphasis Area land allocation.

249.    Under Alternative A of the GSNM Plan, the Plan EIS would have applied standards from the 2001 Sierra Nevada Forest Plan Amendments (SNFPA), which states: "In old forest emphasis areas (46 percent of the Monument) all snags 15 inches or greater would be retained following stand-replacing events except to address imminent hazards to human safety."

250.    In describing Alternative B, the alternative ultimately selected as the 2012 GSNM Plan in the Record of Decision, the Plan EIS states that with that alternative "snags would only be removed from burned forests for safety reasons or ecological restoration. … The change in the number of available snags would be based on a project-level, site specific decision. **More snags in burned forest would be expected across the landscape than in Alternative[] A …."** (emphasis added). This means that the Plan analysis expected the selected alternative B would protect more of the larger snags, not only across all burned forests, but also in old forest emphasis areas, which constitute the vast majority of both Project areas.

251.    Instead of abiding by these tree diameter limits for ecological restoration, the Forest Service has authorized actions, solely for the purpose of ecological restoration that would cut and log dead or fire-killed trees up to 30 inches in diameter in the Castle Fire Area, and cut and log dead or fire-killed trees without any upper diameter limit in the Windy Project area. Implicitly, the removal

of dead trees over 20 inches in diameter here is not clearly needed for ecological restoration and maintenance because their removal is proposed other purposes: fuel reduction and clearing for planting seedlings.

252.     By its authorizations to cut and remove trees over the specified diameter limits, the Forest Service is taking actions that are inconsistent with the standards and guidelines in the GSNM Forest Plan, which violates NFMA. 16 U.S.C. § 1604(i).

253.     The Forest Service's failure to comply with the NFMA and is therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law.

**Count 2:**      **Failure to Comply with the GSNM Forest Plan's Wildlife Habitat Standards for Removing Snags**

254.     The GSNM Plan includes a Monument-wide standard for "Wildlife Habitat," which requires that

> In areas burned by wildfire, including high- and mid-severity patches, manage snag levels to meet ecological restoration objectives, with consideration for the spatial arrangement and density of snags for wildlife needs. Include site-specific considerations such as a wider range of snag sizes and densities, and focal placement of snags and snag patches.

255.     The cited section does not reference the diameter limits from tree felling and removal, and the Forest Service has not included any site-specific prescriptions in its dead tree removal areas that snag levels are to be managed for "wildlife needs." Moreover, there is no discussion or analysis in the EAs that, in removing snags, the Forest Service has considered "a wider range of snag sizes and focal placement of snags and snag patches" for wildlife.

256.     With respect to tree diameter limits, the wildlife habitat standard for snags does not explicitly negate and is not inconsistent with the Plan requirement in Table 46 to limit tree removal to 20 inches in diameter. Leaving more of the larger snags is consistent with ecological restoration and benefits wildlife such as black-backed woodpeckers and other species that forage in burned and unlogged areas, such as Pacific fishers and California spotted owls. Instead, the stated reason for removing snags is not for "wildlife needs," but to reduce fuels and prepare the area for planting seedlings.

257.     While there are hundreds of snags per acre that burned at high severity, which greatly

COMPLAINT                                                                                                    39

benefit wildlife, within tree removal areas, only an average of 4 of the largest snags over 12 inches dbh per acre would be retained on site for wildlife habitat to meet GSNM snag requirements.

258.    This meager snag retention design feature, as the sole standard for wildlife needs hardly satisfies the requirement in the Wildlife Habitat Standard for snags in areas burned by wildfire, whereby "consideration for the spatial arrangement and density of snags for wildlife needs [and] [i]nclude site-specific considerations such as a wider range of snag sizes and densities, and focal placement of snags and snag patches." Both Projects, however, fail to specify these requirements for the large areas proposed for dead tree removal to adequately provide snag habitat for wildlife.

259.    By failing to include site-specific considerations such as specifying a wider range of snag sizes and densities, and focal placement of snag patches, the Forest Service's dead tree removal actions are inconsistent with the Wildlife Habitat Standards for snags in the GSNM Forest Plan, which violates NFMA. 16 U.S.C. § 1604(i).

260.    The Forest Service's failure to comply with the NFMA is therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law.

**REQUEST FOR RELIEF**

261.    For these reasons, Plaintiffs request that the Court:

a)    Declare that the Forest Service has violated the National Environmental Policy Act and its implementing regulations by using an impermissibly narrow purpose and need, and has failed to consider a reasonable range of alternatives;

b)    Declare that the Forest Service has violated the National Environmental Policy Act and its implementing regulations by failing to take a hard look at the direct, indirect, and cumulative effects of the Castle and Windy Projects;

c)    Declare that the Forest Service has violated the National Environmental Policy Act and its implementing regulations by failing to prepare EISs for the major federal actions of the Castle and Windy Projects, which are likely to cause significant environmental effects;

d)    Declare that the Forest Service has violated the National Forest Management Act because the proposed actions are inconsistent with the Giant Sequoia National Monument's Forest Plan

standards and guidelines for tree diameter limits as they apply to all live and dead trees;

e)   Declare that the Forest Service has violated the National Forest Management Act because the proposed actions are inconsistent with the Giant Sequoia National Monument's Forest Plan standards and guidelines for analyzing, protecting, and retaining snag habitats for wildlife;

f)   Set aside the Castle and Windy Project Environmental Assessments, Findings of No Significant Impact, and Decision Notices;

g)   Compel Defendant to prepare an EIS for each or both Projects that properly analyzes the direct, indirect, and cumulative effects of the Project and considers alternatives to the proposed action; and otherwise order Defendants to comply with NEPA before proceeding with further actions;

h)   Compel Defendants to comply with the Giant Sequoia National Monument's Plan standards and guidelines for tree diameter limits and snag wildlife habitat;

g)   Issue injunctive relief prohibiting the Forest Service from implementing the Castle and Windy Fire Projects until such time as the Forest Service can demonstrate compliance with the requirements of the National Environmental Policy Act and National Forest Management Act;

g)   Award Plaintiffs their costs of litigation, including reasonable attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

h)   Provide such other relief as the Court deems just and proper.

Respectfully submitted this 22nd day of April, 2024.

René Voss
*Attorney for Plaintiffs*