TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

JOHN P. TUSTIN (TX Bar No. 24056458)
Senior Attorney
LAWRENCE PITTMAN (GA Bar. 568134)
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone:    (202) 305-3022 (Tustin)
              (202) 305-0420 (Pittman)
Fax:      (202) 305-0275
john.tustin@usdoj.gov
lawrence.pittman@usdoj.gov

*Attorneys for Defendant*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| SIERRA CLUB, EARTH ISLAND INSTITUTE, and SEQUOIA FORESTKEEPER, <br><br> Plaintiffs, <br> v. <br><br> UNITED STATES FOREST SERVICE, <br><br> Defendant. | Case No. 1:24-cv-00473-KES-HBK <br><br> **DEFENDANT'S MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

# Table of Contents

I.   Introduction ...................................................................................................... 1

II.   Legal Background ............................................................................................ 2

    A.   National Forest Management Act ........................................................ 2

    B.   National Environmental Policy Act .................................................... 3

    C.   Administrative Procedure Act .............................................................. 4

III.   Factual Background ......................................................................................... 4

IV.   Argument .......................................................................................................... 5

    A.   The Projects comply with Monument Plan standards for tree diameter and snags ....................................................................................... 5

        1.   The Monument Plan's diameter limits only apply to live trees ................. 6

        2.   The Projects retain four snags per acre, in compliance with the Monument Plan ........................................................................... 7

    B.   The Projects' purpose and range of alternative are not arbitrary or capricious ......................................................................................... 9

        1.   The Projects' purpose and need statements are reasonable ...................... 9

        2.   The Forest Service considered a reasonable range of alternatives ........... 11

    C.   The Forest Service took a "hard look" at the Projects' environmental consequences ............................................................... 15

        1.   The Forest Service considered and disclosed effects to Gray Wolves ..... 15

        2.   The Forest Service considered and disclosed effects to other indicator species ........................................................................... 18

        3.   The Forest Service considered and disclosed cumulative effects ............ 21

        4.   The Forest Service disclosed effects to naturally-regenerating conifer seedlings and considered Plaintiffs' comments on post-fire logging ........................................................................................... 24

    D.   The FONSIs are not arbitrary or capricious ...................................... 26

        1.   The FONSIs summarize the Forest Service's analyses and are entitled to deference ........................................................................ 26

     2.     Plaintiffs have not met their burden to raise substantial questions ........... 28

VI.    Conclusion ..................................................................................................... 30

## Table of Authorities

Page(s)

**Cases**

*Alaska Env'tl Ctr. v. Kempthorne*,
    457 F.3d 969 (9th Cir. 2006) ......................................................................... 11, 13

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009) ............................................................................. 3

*Amoco Prod. Co. v. Vill. of Gambell, Alaska*,
    480 U.S. 531 (1987) ........................................................................................... 30

*Anderson v. Evans*,
    371 F.3d 475 (9th Cir. 2004) .............................................................................. 26

*Animals v. U.S. Dep't of Interior*,
    751 F.3d 1054 (9th Cir. 2014) ...................................................................... 26, 30

*Ark Initiative v. U.S. Forest Serv.*,
    No. 06–cv–02418–WDM–MJW, 2010 WL 3323661 (D. Colo. Aug. 18, 2010) .................... 23

*Audubon Soc'y of Portland v. Haaland*,
    40 F.4th 967 (9th Cir. 2022) ............................................................................... 15

*Bark v. Bureau of Land Mgmt.*,
    643 F. Supp. 2d 1214 (D. Or. 2009) ................................................................... 24

*Bark v. U.S. Forest Service*,
    958 F.3d 865 (9th Cir. 2020) .............................................................................. 25

*Bering Strait Citizens for Resp. Res. Dev. v. U.S. Army Corps of Eng'rs*,
    524 F.3d 938 (9th Cir. 2008) ................................................................................ 3

*Cal. Cmtys. Against Toxics v. U.S. E.P.A.*,
    688 F.3d 989 (9th Cir. 2012) .............................................................................. 30

*California v. Block*,
    690 F.2d 753 (9th Cir. 1982) ........................................................................ 10, 14

*Cascadia Wildlands v. Bureau of Indian Affairs*,
    801 F.3d 1105 (9th Cir. 2015) ...................................................................... 22, 26

*City of Auburn v. U.S. Gov't*,
    154 F.3d 1025 (9th Cir. 1998) ............................................................................ 29

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*,
    123 F.3d 1142 (9th Cir. 1997) .............................................................................. 9

*City of Sausalito v. O'Neill*,
   386 F.3d 1186 (9th Cir. 2004) ............................................................ 4, 15, 19

*Conservation Cong. v. U.S. Forest Serv.*,
   409 F. Supp. 3d 861 (E.D. Cal. 2019) ........................................................ 8

*Conservation Congress Cong. v. Finley*,
   No. 11-4752-SC, 2012 WL 2989133 n.11 (N.D. Cal. June 28, 2012) ..................... 16

*Ctr. for Biological Diversity v. Salazar*,
   706 F.3d 1085 (9th Cir. 2013) .................................................................. 3

*Ctr. for Cmty. Action and Env'tl Justice v. FAA*,
   61 F.4th 633 (9th Cir. 2023) .................................................................. 22

*Ctr. for Env'tl Law & Pol'y v. U.S. Bureau of Reclamation.*,
   655 F.3d 1000 (9th Cir. 2011) ............................................................ 22, 24

*Ctr. for Sierra Nevada Conservation v. U.S. Forest Serv.*,
   832 F.Supp.2d 1138 (E.D. Cal. 2011) ...................................................... 24

*Earth Island Inst. v. Muldoon*,
   82 F.4th 624 (9th Cir. 2023) .................................................................. 26

*Earth Island Inst. v. U.S. Forest Serv.*,
   697 F.3d 1010 (9th Cir. 2012) ......................................................... 4, 18, 25

*Earth Island Inst. v. U.S. Forst Serv.*,
   87 F.4th 1054 (9th Cir. 2023) ......................................................... 7, 12, 14

*Earth Island Institute v. U.S. Forest Service*,
   442 F.3d 1147 (9th Cir. 2006) ............................................................... 21

*Env'tl Prot. Info. Ctr. v. U.S. Forest Serv.*,
   451 F.3d 1005 (9th Cir. 2006) ................................................................. 4

*Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*,
   681 F.2d 1172 (9th Cir. 1982) ............................................................... 29

*Friends of Animals v. Haaland*,
   No. 3:22-CV-00365-ART-CLB, 2024 WL 3599148 (D. Nev. July 30, 2024) ............. 29

*Friends of Endangered Species, Inc. v. Jantzen*,
   760 F.2d 976 (9th Cir. 1985) ................................................................ 28

*Friends of the Wild Swan v. Weber*,
   767 F.3d 936 (9th Cir. 2014) ................................................................ 24

*Greenpeace Action v. Franklin*,
   14 F.3d 1324 (9th Cir. 1992) ................................................................ 28

*Greenwood v. FAA*,
   28 F.3d 971 (9th Cir. 1994) ................................................................. 14

*Headwaters, Inc. v. Bureau of Land Mgmt.*,
   914 F.2d 1174 ................................................................................ 13

*Idaho Conservation League v. Mumma*,
    956 F.2d 1508 (9th Cir. 1992) ................................................................... 14

*In re Big Thorne Project*,
    857 F.3d 968  (9th Cir. 2017) ...................................................................... 9

*Inland Empire Public Lands Council v. U.S. Forest Serv.*,
    88 F.3d 754 (9th Cir. 1996) ......................................................................... 8

*Klamath Forest All. v. U.S. Forest Serv.*,
    No. 3:23-cv-3601-RFL, 2024 WL 4017202 (N.D. Cal., Aug. 23, 2024) ........... 21, 28

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ....................................................................... 3

*Lands Council v. McNair*,
    629 F.3d 1070 (9th Cir. 2010) ................................................................. 4, 5

*League of Wilderness Defs.-Blue Mountains Biodiversity Proj. v.U. S. Forest Serv.*,
    689 F.3d 1060 (9th Cir. 2012) .............................................................. 9, 11

*Makua v. Rumsfield*,
    163 F. Supp. 2d 1202 (D. Haw. 2001) ....................................................... 16

*Marsh v. Oregon Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ...................................................................... 7, 17, 25, 27

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
    177 F.3d 800 (9th Cir. 1999) ................................................................ 11, 14

*National Parks & Conservation Ass'n v. Babbitt*,
    241 F.3d 722 (9th Cir. 2001) ...................................................................... 29

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) .......................................................... 9, 14, 26, 27

*Native Ecosystems Council v. Weldon*,
    697 F.3d 1043 (9th Cir. 2012) .............................................................. 2, 3, 7

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
    137 F.3d 1372 (9th Cir. 1998) .................................................................... 15

*Nw. Env'tl Advocs. v. Nat'l Marine Fisheries Serv.*,
    460 F.3d 1125 (9th Cir. 2006) .................................................. 15, 19, 21, 23, 24, 26

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
    402 F.3d 846 (9th Cir. 2005) ...................................................................... 22

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
    957 F.3d 1024 (9th Cir. 2020) ...................................................................... 3

*Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
    625 F.3d 1092 (9th Cir. 2010) .................................................................... 14

*Oregon Natural Resources Council v. Brong*,
    492 F.3d 1120 (9th Cir. 2007) .................................................................... 21

*Portland Audubon Soc'y v. Lujan*,
   795 F. Supp. 1489 (D. Or. 1992) ........................................................ 16

*Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*,
   113 F.3d 1505 (9th Cir. 1997) ........................................................... 18

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) .................................................................... 4, 15

*S. Fork Band Council of W. Shoshone v. U.S. Dep't of the Interior*,
   588 F.3d 718 (9th Cir. 2009) ............................................................ 30

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ........................................................ 16, 19

*Short Haul Survival Comm. v. United States*,
   572 F.2d 240 (9th Cir. 1978) ............................................................. 4

*Tri–Valley CAREs v. U.S. Dep't of Energy*,
   671 F.3d 1113 (9th Cir. 2012) ........................................................... 17

*W. Watersheds Proj. v. Abbey*,
   719 F.3d 1035 (9th Cir. 2013) .................................................. 12, 13, 14

*W. Watersheds Proj. v. Perdue*,
   No. CV-21-00020-TUC-SHR, 2023 WL 6377287 (D. Ariz. Sept. 29, 2023) ......... 28

*Westlands Water Dist. v. U.S. Dep't of Interior*,
   376 F.3d 853 (9th Cir. 2004) ................................................. 10, 12, 17

*WildEarth Guardians v. Montana Snowmobile Ass'n*,
   790 F.3d 920 (9th Cir. 2015) ........................................................... 21

**Statutes**

16 U.S.C. § 1536(c)(1) ...................................................................... 16

16 U.S.C. § 1604(a) .......................................................................... 3

16 U.S.C. § 1604(i) .......................................................................... 3

16 U.S.C. § 551 ............................................................................. 10

42 U.S.C. § 4332 ........................................................................... 11

5 U.S.C. § 702 .............................................................................. 4

5 U.S.C. § 706(2)(A) ........................................................................ 4

**Regulations**

36 C.F.R. § 220.4(f) .................................................................... 22, 23

40 C.F.R. § 1501.12 ........................................................ 15, 19, 23, 26, 27

40 C.F.R. § 1501.3(b)(1) ................................................................... 28

40 C.F.R. § 1501.3(b)(2) ............................................................... 27, 28

40 C.F.R. § 1501.5(a) .................................................................................... 3, 15

40 C.F.R. § 1501.5(c)(1) ...................................................................................... 27

40 C.F.R. § 1501.5(c)(2) .................................................................................. 11, 12

40 C.F.R. § 1501.5(f) ..................................................................................... 15, 27

40 C.F.R. § 1501.6(a) ........................................................................................... 4

40 C.F.R. § 1501.6(b) .......................................................................................... 27

40 C.F.R. § 1501.6(c) ..................................................................................... 28, 29

40 C.F.R. § 1502.14(a) ........................................................................................ 12

40 C.F.R. § 1502.9(c) .......................................................................................... 25

40 C.F.R. § 1502.9(d) .......................................................................................... 17

40 C.F.R. § 1508.1(g)(3) ................................................................................ 22, 23

40 C.F.R. § 1508.1(s) ........................................................................................... 29

40 C.F.R. § 1508.27 ............................................................................................. 28

**Other Authorities**

85 Fed. Reg. 43,304 (July 16, 2020) ...................................................................... 3

89 Fed. Reg. 35,442 (May 1, 2024) ....................................................................... 3

**Table of Acronyms**

| APA | Administrative Procedure Act |
|-----|------------------------------|
| BA | Biological Assessment |
| dbh | Diameter at Breast Height |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| FWS | U.S. Fish and Wildlife Service |
| GSNM | Giant Sequoia National Monument |
| MUSYA | Multiple-Use and Sustained Yield Act |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NFS | National Forest System |

The Forest Service lodged the Administrative Records for the Projects on June 10, 2024, and additional documents on July 18, 2024. ECF Nos. 14, 17. Citations to the administrative record are denoted with "AR[Bates number]."

# I.    Introduction

In 2020 and 2021, two devastating wildfires burned portions of the Giant Sequoia National Monument (Monument) and the Sequoia National Forest (Forest) in Tulare County, California. The fires were among the largest in the Monument's recent history and burned more than 200,000 acres of National Forest System (NFS) land. The fires killed more than 10,000 giant sequoias and countless trees of other species and wildlife. The dead and dying trees in the fires' wake threaten public safety, contribute fuel for future fires, and impede the successful reforestation of the landscape.

To address this devastation and to restore the ecological integrity of the Monument and Forest, the Forest proposed two projects: the Castle Fire Ecological Restoration Project (Castle Project) and the Windy Fire Restoration Project (Windy Project). The Projects propose a combination of treatments that will improve forest health and resiliency, reduce fuels, and reforest components of wildlife habitat. Treatments include felling and removing dead and dying trees in high severity burned areas, along road corridors, in the Wildland Urban Interface, and in high fuel loading areas. The Projects also authorize fuel reduction through mechanical treatments and prescribed fire, as well as reforestation, watershed and meadow restoration and road maintenance. In full compliance with the National Environmental Policy Act (NEPA), the Forest Service analyzed in two Environmental Assessments (EAs) the environmental effects of the proposed activities. The EAs and supporting documentation contain rigorous environmental analyses and allowed for public participation. As required by the National Forest Management Act (NFMA), the EAs demonstrate how the Projects comply with the governing land and resource management plans. Based on the EAs, the Forest issued two Findings of No Significant Impacts (FONSIs), which document the Forest's determination that the Projects do not have significant environmental effects and thus do not require the preparation of Environmental Impact Statements (EISs). The Forest issued two Decision Notices in December 2023, allowing the Project activities to proceed.

Plaintiffs filed suit alleging the Projects violate the NFMA and NEPA. Plaintiffs' claims are reviewed under the Administrative Procedure Act's (APA) deferential standard of review and

the rule of reason. Plaintiffs' two-count NFMA claim asserts the Projects fail to comply with the land and resource management plan's diameter limits for removing trees and standards for retaining standing dead trees (snags). These claims fail. Here, the Forest Service reasonably interpreted its own land management plans and demonstrated the authorized activities satisfy standards for tree diameter removal and snag retention. Plaintiffs' three-count NEPA claim also falls short. First, Plaintiffs allege the Projects' purpose and need statements unreasonably constrain the choice of alternatives by emphasizing a "policy choice" of fuels reduction. But an agency can include policy objectives in a proposal, and the purpose and need statement does not constrain how the Projects attain fuels reduction. Plaintiffs next allege the EAs lack adequate analyses of a host of issues, ranging from gray wolves and other wildlife to cumulative impacts to natural regeneration and increased fire risk. This count ignores the fundamental NEPA concepts of incorporation by reference and aggregation, which allow an agency to consider and disclose environmental effects elsewhere in the Record or as part of the environmental baseline. Plaintiffs' third NEPA count alleges the Projects "may" have significant environmental effects and that the Forest Service should have prepared environmental impact statements instead of EAs. Based on the analyses in the EAs and specialist reports, the Forest Service reasonably determined, and adequately explained, that the Projects would not have significant effects as defined by NEPA and that EISs were not required.

The Forest Service satisfied its procedural obligations under NEPA and demonstrated compliance with NFMA. Plaintiffs have not met their burden to show the Projects are arbitrary and capricious under the APA. The Court should grant summary judgment for the Forest Service on all claims and deny Plaintiffs' motion for summary judgment in its entirety.

## II.    Legal Background

### A.    National Forest Management Act

"NFMA and its implementing regulations provide for forest planning and management by the Forest Service on two levels: (1) forest level and (2) individual project level." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). At the forest level, NFMA directs the Department of Agriculture to "develop, maintain, and, as appropriate, revise land and

resource management plans [or "forest plans"] for units of the National Forest System…" 16

U.S.C. § 1604(a). At the project level, the agency implements the forest plan through site-

specific projects, which must be consistent with the applicable forest plan. 16 U.S.C. § 1604(i).

"[O]ur… caselaw establishes that we give the Forest Service ample latitude in ensuring the

consistency of its actions with Forest Plans..." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957

F.3d 1024, 1035 (9th Cir. 2020). A court may "conclude that the Forest Service acts arbitrarily

and capriciously only when the record plainly demonstrates that the Forest Service made a clear

error in judgment in concluding that a project meets the requirements of the NFMA and relevant

Forest Plan." *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008), *overruled on other*

*grounds by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 n.10 (9th Cir.

2009). "[T]he Forest Service's interpretation and implementation of its own Forest Plan is

entitled to substantial deference." *Native Ecosystems Council*, 697 F.3d at 1056.

**B.**   **National Environmental Policy Act**

NEPA is a procedural statute – it "does not contain substantive environmental standards,

nor does the Act mandate that agencies achieve particular substantive environmental results."

*Bering Strait Citizens for Resp. Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th

Cir. 2008). Instead, NEPA merely requires that federal agencies "perform environmental analysis

before taking any 'major Federal actions significantly affecting the quality of the human

environment.'" *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1094 (9th Cir. 2013)

(quoting 42 U.S.C. § 4332(2)(C)). To satisfy this procedural requirement, an agency may prepare

an EA "for a proposed action that is not likely to have significant effects or when the

significance of the effects is unknown." 40 C.F.R. § 1501.5(a) (2020).[1] An EA is "a concise

public document prepared by a Federal agency to aid an agency's compliance with [NEPA] and

support its determination of whether to prepare an [EIS] or a [FONSI]..." *Id.* § 1508.1(h). If an

---

[1] The Council on Environmental Quality (CEQ) promulgates regulations implementing NEPA. CEQ revised its regulations in 2020 and again in 2024. *See* 85 Fed. Reg. 43,304 (July 16, 2020) and 89 Fed. Reg. 35,442 (May 1, 2024). The Forest Service applied CEQ's 2020 regulations because they were in effect at the time the Agency prepared the EAs and issued the Decision Notices and FONSIs. Unless otherwise noted, all citations to the CEQ regulations in this brief are to the 2020 regulations.

agency concludes the proposed action has no significant effect, "it may issue a FONSI in lieu of preparing an EIS." *Env'tl Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006); *see* 40 C.F.R. § 1501.6(a). "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

**C.      Administrative Procedure Act**

NFMA and NEPA do not provide a private cause of action. *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012). Instead, a court reviews agency compliance with NFMA and NEPA under the APA, 5 U.S.C. § 702. *Id.* Under the APA, a court may set aside agency action only when it concludes the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Judicial review under the APA is "highly deferential," extremely narrow, and "presumes agency action to be valid." *Short Haul Survival Comm. v. United States*, 572 F.2d 240, 244 (9th Cir. 1978). A court cannot "substitute [its] own judgment for that of the agency." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004). And courts "must be at [their] most deferential when reviewing scientific judgments and technical analyses within the agency's expertise." *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (cleaned up). Judges are not to "act as a panel of scientists, instructing the agency, choosing among scientific studies, and ordering the agency to explain every possible scientific uncertainty." *Id.*

**III.      Factual Background**

The Giant Sequoia National Monument and the Sequoia National Forest in central California is a unique landscape of groves of giant sequoias interspersed with coniferous trees. AR87717. Two recent wildfires, the Castle Fire (August 2020) and the Windy Fire (September through December 2021) burned more than 200,000 acres of NFS land on the Monument and Forest. AR6 (Castle, 129,218 acres), 6672 (Windy, 75,384 acres). The two fires left tens of thousands of acres of dead and dying trees across nineteen giant sequoias groves. *Id.* In the Giant Sequoia Groves themselves, the Forest Service estimates that the Castle Fire killed between 31%

to 42% (7,500 to 10,600 individuals) of large sequoias (diameters over 4 feet) within the Castle Fire footprint – or 10% to 14% of all large sequoias across the tree's natural range in the Sierra Nevada. AR378. The Windy Fire killed an estimated 931 to 1,257 large sequoias in the fire's footprint, or between 1% and 2% of all large sequoias. AR7322. Beyond the devastation to the giant sequoias, the dead and dying trees create significant risks to public safety and hinder forest restoration and resiliency work. AR6-8, 6674-75. The dead and dying trees also increase fuel loading on the Forest, which will contribute to the severity and intensity of the next fire. *Id.*

The Forest Service initiated scoping for the Castle Project in January 2021 and the Windy Project in September 2022. AR4422-23, 8590-93. The robust NEPA processes provided multiple opportunities for public participation and resulted in EAs and Decision Notices for both Projects. AR3-72, 73-81, 6667-738, 6647-56. As analyzed in the EAs, the Projects propose to identify, fell, and remove trees in areas with high mortality from high severity fire, drought, and insect infestation, and in stands with high fuel loads. AR9, 6677. The Projects authorize road maintenance where necessary, prescribed burning, meadow and watershed restoration, and reforestation. AR8-16, 6683-85; *see also* AR6 (Table 1, Castle), 6649, 6679-82 (Windy). The Forest prepared maps to identify where treatments occur within each Project. AR48-50, 6678. The Projects also include dozens of design features to protect resources and improve implementation. AR51-63, 6711-20.

Based on the analyses in the EAs and supporting documentation, the Forest Service determined that the Projects would not have significant environmental effects as defined by NEPA and issued FONSIs. AR40-43, 6653-54. The Forest Supervisor signed Decision Notices for both Projects in December 2023. AR73-81, 6647-56. Implementation began in the spring of 2024, depending on site conditions. AR81, 6656.

## IV.    Argument

### A.    The Projects comply with Monument Plan standards for tree diameter and snags.

Plaintiffs' NFMA claim alleges the Projects do not comply with Giant Sequoia National Monument Management Plan (Monument Plan) standards for diameter limits and snag retention. Pls.' Mem. In Supp. of Mot. for Summ. J. 8-13, ECF No. 18-1 (Pls.' Mem.); Compl. ¶¶ 241-260

(NFMA Claim, Counts One and Two).[2] Neither of Plaintiffs' NFMA arguments have merit. The diameter limits only apply to live trees, not snags. For snags, the Projects contain the required site-specific standard of retaining four snags per acre.

    1.   <u>The Monument Plan's diameter limits only apply to live trees.</u>

       Vegetation Standard and Guideline Two from the Monument Plan says, "[w]hen implementing vegetation and fuels treatments, retain all conifer trees with a dbh [diameter at breast height] of 20 inches or greater in westside forest types. Retain montane hardwoods with a dbh of 12 inches or larger in westside forest types." AR87791. Table 46 of the Monument Plan contains additional diameter limits for trees in various land allocations or by species. AR87786.

       The crux of Plaintiffs' argument is the contention that the diameter limits in Vegetation Standard Two apply to all trees, whether living or dead. This contention – treating live trees and snags the same – flies in the face of basic forest ecology. For example, the Monument Plan EIS plainly distinguishes between trees, snags and down woody material for vegetation treatments. *See, e.g.,* AR87935, 87949 ("All of the alternatives would allow short-term reductions in habitat quality by removing trees, snags, and down woody material."). When Plaintiffs raised their interpretation during the administrative process for the Castle Project, the Reviewing Officer directed the Forest to "[c]larify how the project complies with the [Monument] Plan with respect to the diameter limits outlined in Table 46." AR1056. The final Decision Notice and errata for the Castle Project provide the required clarification, explaining that the Monument Plan "was written for a green forest not severely impacted by wildfire, with the term 'trees' describing live, green trees and 'snags' describing dead trees." AR80; *see* AR1-2 (errata, adding language to the Response to Comment C-2.6). The final Decision Notice and errata also clarified that the diameter limits in Table 46 apply to live, green trees – not to dead trees. AR80 ("[T]here are no diameter limits for cutting or removal of dead trees/snags."). The Forest Service thus provided a rational and well-supported reason for why the Monument Plan's tree diameter limits do not

---

[2] Approximately 90% and 88% of the Castle and Windy Projects, respectively, are located within the Monument. AR6, 6677. In these areas, standards and guidelines from the Monument Plan apply. AR87714.

apply to dead trees. The Forest's interpretation and implementation of its own Forest Plan is entitled to substantial deference. *Native Ecosystems Council*, 697 F.3d at 1056.

Plaintiffs raised a similar objection to the Windy Project, but because Plaintiffs failed to raise this issue in their comments on the Windy EA, the Reviewing Officer did not instruct the Forest to provide additional clarification in the Windy Decision Notice. AR8267 (citing 36 C.F.R. § 218.8(c), which requires "issues raised in objections must be based on previously submitted specific written comments…"); *Earth Island Inst. v. U.S. Forst Serv.*, 87 F.4th 1054, 1064 (9th Cir. 2023) (finding failure to exhaust an argument not raised during comments). Even if the Court were to consider this unexhausted argument for the Windy Project, it has no merit because the Forest explained in the Windy EA and Objection Response that the diameter limits in the Monument Plan only apply to green (live) trees, not snags. AR6702, 8267; *see also* AR7379 (Fire and Fuels report) ("Live tree removal in the Monument is limited to trees less than 20 inches diameter at breast height (DBH).")

Plaintiffs do not mention the additional clarification the Forest provided in its final Decision Notice and errata. Instead, they seem to rely on a policy argument that "leaving more of the larger snags is consistent with ecological restoration and benefits species…." Pls.' Mem. 10; *see id.* at 11 (describing alternatives analyzed it in the Monument Plan EIS). Whatever the merits of Plaintiffs' preferences for tree removal, they fail to show that the Forest Service's interpretation of Vegetation Standard Two is arbitrary and capricious. *Native Ecosystems Council*, 697 F.3d at 1056. To the extent there is a dispute about whether removing thousands of dead trees restores the Monument and benefits species, the Court must defer to the Forest Service's expert conclusions, not Plaintiffs' lay interpretations. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

   2.   The Projects retain four snags per acre, in compliance with the Monument Plan.

Plaintiffs' second NFMA challenge concerns Monument Plan requirements for snag retention. Pls. Mem. 12-13; Compl. ¶¶ 254-260.

The Monument Plan's Wildlife Standard and Guideline Two manages snag levels for ecological restoration. AR87796. For areas burned by wildfire, the Forest Service manages "with consideration for the spatial arrangement and density of snags for wildlife needs. Include site-specific considerations such as a wider range of snag sizes and densities, and focal placement of snags and snag patches." *Id.* Both Projects satisfy this standard by requiring an average of four large snags (over 12" dbh where available) per acre to be retained on site for wildlife habitat and to retain these snags in patches or clumps. AR52 (Castle, design feature WL-3); AR7380 (Windy, fuels report treatment prescriptions); AR90657 (2001 Sierra Nevada Forest Plan Amendment); *see also* AR26 (stating that "[s]nags and larger down woody debris would be left for wildlife habitat where it doesn't cause a hazard."); AR6681 ("The largest snags in a treatment area would be retained to meet wildlife and [Monument] snag requirements.").

Plaintiffs wrongly claim that the Forest Service "has not included any site-specific prescriptions in its dead tree removal areas" for wildlife, but then – in the same sentence – acknowledge the four snag per acre retention requirement that applies to both Projects. Pls.' Mem. 12. The four snag per acre retention requirement *is* the site-specific prescription. *Inland Empire Public Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 757 (9th Cir. 1996) ("[S]ite-specific projects must be consistent with the stage-one, forest-wide plan."). The numerical standard may be averaged – as the agency did here – across the Project area. *Conservation Cong. v. U.S. Forest Serv.*, 409 F. Supp. 3d 861, 883 (E.D. Cal. 2019) (finding a project complies with forest plan standards for snags "because it plans to retain at least three snags per acre of the largest representative diameter size, averaged across the unit."). Plaintiffs provide no authority that Monument Plan requirements apply at a more granular level than the Project level (*i.e.*, treatment units within the Project area). Plaintiffs then seem to argue that the Forest Service did not provide enough detail about the spatial arrangement of retained snags for wildlife needs. Pls.' Mem. 12. But the Monument Plan requires snags to be left in clumps or patches where possible (AR52), and the wildlife reports clearly identify how the clumped distribution is intended to benefit wildlife habitat. AR494; *see also* AR85944 (discussing clumps as a habitat feature for fisher). Plaintiffs' demand for additional, irrelevant detail does not show the Forest Service's

decision is arbitrary and capricious because the Forest Service "suppl[ied] a rational connection between the facts found and the conclusions made." *In re Big Thorne Project*, 857 F.3d 968 , 975 (9th Cir. 2017) (cleaned up).

In sum, the Forest Service provided a rational interpretation of its own Monument Plan and showed how the Projects comply with Monument Plan standards for diameter limits and snag retention. The Court should grant summary judgment in favor of Defendants on Plaintiffs' NFMA claims.

**B.**   **The Projects' purpose and range of alternative are not arbitrary or capricious.**

Plaintiffs' first of three NEPA counts alleges that the Projects' purpose and need statements are too narrow and that the Forest Service failed to analyze a reasonable range of alternatives. Pls.' Mem. 13-17; Compl. ¶¶ 203-214 (NEPA claim, Count One).

"The stated goal of a project necessarily dictates the range of reasonable alternatives and an agency cannot define its objectives in unreasonably narrow terms." *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997) (cleaned up). Alternatives that do not advance the purpose of a project will not be considered reasonable or appropriate. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1247 (9th Cir. 2005). Courts "review the purpose and need, along with the choice of alternatives, under a reasonableness standard or rule of reason. [Courts] first determine whether the statement of purpose and need was reasonable, and then whether the range of alternatives considered was reasonable in light of that purpose and need." *League of Wilderness Defs.-Blue Mountains Biodiversity Proj. v. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012) (cleaned up).

1.   The Projects' purpose and need statements are reasonable.

The purpose and need statements establish the Projects' goals to remove excess fuels from the fire damaged landscape, improve the health and resiliency of the remaining green forests (including the giant sequoia groves), provide safe access along roads, reforest high severity burned areas, promote wildlife habitat, and restore watersheds and meadows. AR8, AR6674. The Projects' purpose and need statements are a reasonable response to the catastrophic

effects of two recent wildfires and enable the Forest Service to restore the ecological integrity of the Monument and Forest. AR07-8, 6674-75.

Plaintiffs claim the purpose and need statement is too narrow because the Forest included the "policy choice" of fuels reduction as one of its elements. Pls.' Mem. 13-14. Plaintiffs fail to show the purpose and need statement is arbitrary and capricious for four reasons.

First, an agency can consider policy objectives in a purpose and need statement. *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) ("The focal point of our inquiry must be the underlying environmental policy, and whether the agency's proposed action comports with that policy."); *Westlands Water Dist. v. Dep't of Interior*, 376 F.3d 853, 867-68 (9th Cir. 2004). Plaintiffs cite no authority that precludes the Forest Service from including fuels reduction as a policy objective. Inclusion of fuels reduction as an element does not improperly foreclose consideration of other ecological restoration and forest resiliency methods. *Westlands*, 376 F.3d at 867. ("Because the Statement of Purpose and Need does not improperly foreclose consideration of any possible restoration measures, we reverse any part of the district court's Order disapproving of the Statement.)

Second, when evaluating the reasonableness of a purpose and need statement, courts must consider the statutory context of the proposed action. *Id.* at 866 ("Where an action is taken pursuant to a specific statute, the statutory objectives of the project serve as a guide by which to determine the reasonableness of objectives outlined in an [environmental document]."). Inclusion of fuels reduction aligns with authority granted in the Forest Service's Organic Act of 1897 and the Multiple-Use and Sustained Yield Act of 1960 (MUYSA). The Organic Act requires the Secretary of Agriculture to "make provisions for the protection against destruction by fire … upon the public forests and national forests…." 16 U.S.C. § 551. In the MUYSA, Congress said, "national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." *Id*. at § 528. The Castle Project's purpose and need element 1 removes excess fuels to reduce the risk of large, stand-replacing fires, reduce threats from wildland fires in the Wildland Urban Interface, and create safe working conditions to allow for reforestation activities. AR8. The Windy Project's purpose and need element 1 restores

ecological integrity through, among other means, removing dead and decaying trees that are a fuel source for future high severity fires. AR6675. Both elements are well-aligned with the Forest Service's broad authority over NFS lands prescribed in the Organic Act and the MUSYA. *See League of Wilderness Defs.*, 689 F.3d at 1070 ("The Organic Act gives the Service authority to 'make provisions for the protection against destruction by fire.'" (quoting 16 U.S.C. § 551)).

Third, when read in context with the other elements, allowing fuels reduction does not unreasonably narrow the range of alternatives. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 812–13 (9th Cir. 1999) (per curiam) (statement of purpose and need "appear[ed] too narrow" when read in isolation, but was ultimately reasonable because it "expressly incorporate[d]" broader objectives). Both Projects' purpose and need statements provide objectives to restore wildlife habitat, re-establish ecological integrity, and improve reforestation and watershed conditions. AR6674, AR08. The purposes of the Projects are far broader than just removing dead trees and allow for flexibility in treatments, so long as the Projects' goals are not substantially undermined.

Finally, to the extent the element of fuels reduction is limited to just tree removal, this activity is consistent with the Forest Plan and the Monument's Proclamation because both documents discuss the removal of trees for ecological restoration and maintenance or public safety. AR87787, 87796, 89374. Plaintiffs' belief that "external management documents" further constrain the Windy Project's purpose and need is wholly unsupported. Pls.' Mem. 14 (citing AR6674). Plaintiffs assert that several external documents, including a set of guiding principles and an MOU with California unreasonably constrain the purpose and need but to the contrary, the documents referenced in the Windy EA are non-binding guiding principles. AR6674.

2.   The Forest Service considered a reasonable range of alternatives.

NEPA's implementing regulations require EAs to "briefly discuss….[a]lternatives as required by [42 U.S.C. § 4332] of NEPA." 40 C.F.R. § 1501.5(c)(2). "An agency need not, therefore, discuss alternatives similar to alternatives actually considered, or alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives [of the project]." *N. Alaska Env'tl Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) (cleaned up). "For

alternatives that the agency eliminated from detailed study, [the agency shall] briefly discuss the reasons for their elimination." 40 C.F.R. § 1502.14(a); *W. Watersheds Proj. v. Abbey*, 719 F.3d 1035, 1046-47 (9th Cir. 2013).

The Projects considered two alternatives in detail: the proposed action and no action. AR21-35, 6692-6701. The proposed actions authorize activities that implement the elements of the Projects' purpose and need statements, while the no action alternatives maintain the status quo and provided a comparative baseline. The Forest Service's consideration of these two alternatives for both projects satisfies NEPA. 40 C.F.R. § 1501.5(c)(2); *Earth Island Inst.*, 87 F.4th at 1065 ("We have repeatedly held that an agency satisfies NEPA when it considers only two alternatives – action and no action."). The Forest Service also considered several other alternatives during Project development. AR17-19, 6686-89. The Forest Service eliminated these alternatives from detailed study and provided a brief explanation for why none met the Projects' purpose and need. AR17-19, AR6686-69. This satisfies NEPA. 40 C.F.R. § 1502.14(a); *see Westlands Water Dist.*, 376 F.3d at 871–72 ("It would turn NEPA on its head to interpret the statute to require that an agency conduct in-depth analyses of alternatives that are inconsistent with the agency's policy objectives." (cleaned up)).

The only proposed alternatives Plaintiffs discuss in their brief are variations of one that does not remove trees. Pls.' Mem. 15-16. Plaintiffs claim the Projects could have achieved their goals through natural regeneration, roadside hazard tree felling without removal, and prescribed fire instead of commercial thinning. *Id.* Plaintiffs also claim the Forest could have used mechanical treatments to "break up the abundant and extensive fuels without tree removal…[with] machine piling and burning thousands of piles on almost 5,000 acres." *Id.* at 16. (quoting AR17-18). Both Projects briefly considered alternatives that did not involve tree removal. AR17-18 (Castle dismissed alternatives 2 and 5); AR6686 (Windy dismissed alternative 2). The EAs explained that leaving dead and dying trees in place does not address the critical need to reduce the amount of biomass that would contribute to the next high severity wildfire. AR17-18, 6686. Additionally, leaving biomass in place creates impassible dead landscapes, because the dead trees – which are not a seed source – will pile on top of each other

and thus inhibit safe access and forest restoration. *Id.* Plaintiffs' preferred alternative of no tree removal did not need to be considered in detail because it is "infeasible, ineffective, [and] inconsistent with the basic policy objectives for the Project." *N. Alaska Env'tl Ctr.*, 457 F.3d at 978  (quoting *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1180-81).

Plaintiffs claim "economic reasons" precluded the Forest Service from considering a no tree removal alternative in detail. Pls.' Mem. 16. Not so. The Forest Service did state that spending money to replant an area that likely would reburn at high severity in the next decade would not be an appropriate use of taxpayer funds. AR17. But Plaintiffs' myopic focus on a single statement ignores the other reasons the Forest Service provided for why not removing trees is infeasible: there are no seed sources, the dead trees will create impassible areas and contribute fuel to the next fire, and heavy mechanical treatments such as machine piling and burning thousands of acres of down dead trees would result in major impacts to soils that are already fragile from the fires. AR17-18. None of these are "economic reasons," and all show that not removing trees is simply an impractical and infeasible alternative that the Forest Service reasonably eliminated from further consideration. *N. Alaska Env'tl Ctr.*, 457 F.3d at 978; *W. Watersheds Proj.*, 719 F.3d at 1046-47.

Plaintiffs also argue the Monument Proclamation "almost mandates" the Forest Service consider alternatives without tree removal. Pls.' Mem. 15-16. A plain reading of the Proclamation's text contradicts Plaintiffs' interpretation. The Proclamation states, "these forests need restoration to counteract the effects of a century of fire suppression and logging. Fire suppression has caused forests to become denser in many areas, with increased dominance of shade-tolerant species. Woody debris has accumulated, causing an unprecedented buildup of surface fuels." AR89372. As detailed in both Projects' Fire, Fuels and Air Quality Reports, high densities of snags and down woody fuels have the potential for high severity reburn in subsequent fires. Following a severe wildfire in forested areas, dead trees will eventually fall and increase the surface fuel loading. AR391, 7332. As discussed in the Project EAs, natural regeneration and planted seedlings are vulnerable to future fires unless dead trees and woody

debris are reduced. AR27, 6682-83. The Projects are carefully designed to restore natural forest resilience, reduce the risk of wildfire, and protect the sequoia groves. AR8, 6694-95.

None of Plaintiffs' cases support their argument that the Forest Service did not consider a reasonable range of alternatives. Most of Plaintiffs' cases concern EISs, not EAs.[3] But "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Native Ecosystems Council*, 428 F.3d at 1246. The Ninth Circuit has "repeatedly held that an agency satisfies NEPA when it considers only two alternatives – action and no action" in an EA. *Earth Island Inst.*, 87 F.4th at 1065. The only case with an EA that Plaintiffs rely on in their brief is *Western Watersheds Project v. Abbey*. Pls.' Mem. 16 (citing 719 F.3d at 1052). But the flaw in that case was that the EA did not consider a reasonable range of alternatives because there was no true "no action" alternative. 719 F.3d at 1050-51 ("Each of the four alternatives considered in detail, including the no-action alternative, would have reauthorized grazing at the exact same level."). Here, both Projects considered no action alternatives that would maintain the status quo and current level of management, but would not authorize any activities to specifically address the devastation caused by the Castle or Windy fires. AR21-25 (Castle), 6692-94 (Windy).[4]

The Projects' purpose and need statements reasonably include a goal to reduce fuel loading. The inclusion of this goal did not constrain the alternatives considered, and the Forest Service considered a reasonable range of alternatives when it analyzed the Projects. The Court should grant judgment in favor of the Forest Service on Count One of Plaintiffs' NEPA claim.

---

[3] Pls.' Memo 15-17, citing *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1516 (9th Cir. 1992) ("The ICL's complaint is that the faulty EIS has made possible development that wilderness designation would have prevented."); *Muckleshoot Indian Tribe*, 177 F.3d at 809 ("In evaluating whether an agency's EIS complies with NEPA's requirements…"); *Block*, 690 F.2d at 761 ("Under this standard of review, we employ a 'rule of reason' that inquires whether an EIS contains a 'reasonably thorough discussion of the significant aspects of the probable environmental consequences.'"); *Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1124 (9th Cir. 2010) ("The EIS violated NEPA in the ways we have stated.").

[4] In a footnote, Plaintiffs argue that the size of the two Projects requires consideration of more than an action and a no action alternative. Pls.' Mem. 17, n.10. The Court should not consider this barely articulated argument. *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("[A] bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review."). Defendants address Plaintiffs' argument that the size of the Projects require the preparation of an EIS in Part IV.D, *infra*.

**C.** **The Forest Service took a "hard look" at the Projects' environmental consequences.**

Plaintiffs' second NEPA count alleges the EAs did not adequately analyze four topics: (1) gray wolves, (2) other species, (3) cumulative effects, and (4) natural regeneration and increased fire risk. Pls.' Mem. 17-26; Compl. ¶¶ 215-228 (NEPA Claim, Count Two).

NEPA requires federal agencies take a "hard look" at the environmental consequences of their proposed actions. *Robertson*, 490 U.S. at 350-51. "[F]or a proposed action that is not likely to have significant effects or when the significance of the effects is unknown," an agency may prepare an EA that takes a hard look at the direct, indirect, and cumulative effects of its proposed action and all alternatives. 40 C.F.R. § 1501.5(a). A hard look is a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998). "NEPA requires not that an agency engage in the most exhaustive environmental analysis theoretically possible, but that it take a 'hard look' at relevant factors." *Nw. Env'tl Advocs. v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1139 (9th Cir. 2006); *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 984 (9th Cir. 2022) ("In performing this review, we do not fly-speck [the agency's] analysis and hold it insufficient on the basis of inconsequential, technical deficiencies.") (cleaned up). The environmental analysis itself need not contain all requisite information. Indeed, EAs are supposed to be concise documents and are limited to 75 pages (excluding appendices or written approval). 40 C.F.R. § 1501.5(f). NEPA also requires incorporation by reference, so long as the incorporated material is cited, briefly described, and reasonably available for inspection. 40 C.F.R. § 1501.12; *City of Sausalito*, 386 F.3d at 1214.

The EAs and supporting documents in the Administrative Record adequately analyze relevant environmental effects of the Projects. Plaintiffs' demand for additional detail is not required and would not contribute to informed decisions.

1.   The Forest Service considered and disclosed effects to Gray Wolves.

In August 2023, after the Forest Service completed the Projects' EAs, the California Department of Fish and Wildlife confirmed the existence of a wolf pack in the Forest and Monument. AR89993. To address this new information, the Forest Service completed an

1   Addendum to the Biological Assessment (BA) that examined impacts on the newly identified

2   wolf pack. AR89951-89983. The Addendum provides a rigorous evaluation of the Projects'

3   effects on the wolves and critical habitat within the Projects' areas. *Id.* The Addendum identifies

4   the species' action areas, effects of the Projects on the species, and design features to minimize

5   effects to the species. AR89968-78, 90004. The Forest Service determined that the Projects may

6   affect but are not likely to adversely affect the gray wolf. AR89977. The Fish and Wildlife

7   Service (FWS) concurred with the Forest Service's determination and highlighted design criteria

8   that minimize potential disturbance to gray wolves. AR89947-49. The Forest Service's Decision

9   Notices, issued after FWS's concurrence, provide a short summary of the effects analysis

10  completed for the gray wolf and incorporate the Addendum to the BA by reference. AR80-81,

11  6655-6656. The Forest Service made the Addendum and letter of concurrence publicly available

12  by posting them on its website. AR81, 6655.

13        Plaintiffs' principal argument is that the Projects' EAs and FONSIs themselves do not

14  discuss effects on wolves. Pls.' Mem.18-19. This elevates form over substance; the analysis

15  contained in the Forest Service's Addendum to the BA and consultation with FWS satisfies the

16  Forest Service's NEPA obligation to analyze effects to Federally listed species and their critical

17  habitat and supports the conclusion that the Projects will not have significant effects to the wolf.

18  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 650 (9th Cir. 2014) ("Congress

19  specifically contemplated that an agency could comply with NEPA while discharging its duties

20  under Section 7 of the ESA." (citing 16 U.S.C. § 1536(c)(1)); *Conservation Cong. v. Finley*, No.

21  11-4752-SC, 2012 WL 2989133, at *12 n.11 (N.D. Cal. June 28, 2012) ("For the purposes of

22  evaluating Plaintiffs' NEPA claims, the Court also considers the disclosures and analysis in the

23  Forest Service's Biological Assessment."). Both district court cases cited by Plaintiffs for a

24  contrary proposition pre-date *San Luis & Delta Mendota Water Authority* and *Point Hope* by

25  more than a decade. *See* Pls.' Mem. 19 (citing *Portland Audubon Soc'y v. Lujan*, 795 F. Supp.

26  1489 (D. Or. 1992) and *Makua v. Rumsfeld*, 163 F. Supp. 2d 1202 (D. Haw. 2001). The Forest

27  Service satisfied its duty under NEPA to examine the Projects' effects to gray wolves.

28

Plaintiffs also seem to argue that the process by which the Forest Service analyzed the newly discovered gray wolf information violated NEPA. Pls.' Mem. 19 and 19 n.13 (citing 40 C.F.R. § 1502.9(d)). An agency "need not supplement an [environmental analysis] every time new information comes to light after the [environmental analysis] is finalized." *Marsh*, 490 U.S. at 373. "When new information emerges after the circulation and public comment period of the [draft environmental analysis], it may be validly included in the [final environmental analysis] without recirculation." *Westland Water Dist.*, 376 F.3d at 873. Here, the new information about wolves emerged after the Forest Service completed the EAs but before the Forest Service issued the Decision Notices. The Forest Service thus reasonably paused its authorization of the Projects to engage in a thorough consideration of the new information, including consultation with FWS. The decision to include the analysis of the new information in the Decision Notices, rather than in stand-alone supplemental environmental analyses, does not violate NEPA. *Id*. To the extent Plaintiffs disagree with the Forest Service's determination that the presence of wolves was not significant within the meaning of NEPA, "[w]hether new information requires supplemental analysis is a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Tri–Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012) (cleaned up). The Forest Service reasonably determined that the presence of gray wolves was not "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" and that formal supplementation was not required. 40 C.F.R. § 1502.9(d).[5]

Plaintiffs cite two studies they think contradict the Forest Service's analyses of effects to gray wolves. Pls.' Mem. 19. To the contrary, these studies were conducted on British Columbia's Central and North Coast where large-scale clear cutting threatens wolf habitat. AR89800. In contrast, the Sierra Nevada is an entirely different ecosystem and there is no support in the record that clear cutting has ever occurred in the Monument (it has not). Further, contrary to

---

[5] Plaintiffs complain the Forest Service did not adequately analyze cumulative impacts to wolves because it allegedly did not consider other logging projects in the BA or respond to studies about impacts to wolves from logging. Pl.'s Mem. 19. As discussed in Part IV.C.3, *infra*, the Forest Service's cumulative effects analysis satisfies NEPA because it aggregates impacts and relies on Administrative Record documents beyond just the EA and amended BA.

Plaintiffs' suggestion, the Addendum also provided Project-specific analyses of impacts to deer, the relationship between deer and gray wolves, the possibility of displacement, and adverse effects dead tree removal and fuel reduction may have on wolves. AR89967, 89969-75, 89978, 90008. *See Earth Island Inst.*, 697 F.3d at 1020 ("The duty to disclose and respond to 'responsible opposing viewpoints' imposed by 40 C.F.R. § 1502.9(b) applies only to environmental impact statements, not environmental assessments.").

While Plaintiffs may prefer that the Forest Service follow a different procedure or provide more analysis about the newly discovered wolves, the agency fully satisfied NEPA. *Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997) (cautioning against tasking agencies "with a [S]isyphean feat of forever starting over in their environmental evaluations, regardless of the usefulness of such efforts").

    2.   <u>The Forest Service considered and disclosed effects to other indicator species.</u>

The Forest Service's EAs analyze the Projects' effects to terrestrial and aquatic wildlife in accordance with NEPA. AR24-25, 32-33, 6690-91, 6703-04. The EAs identified effects to wildlife habitat as an issue to be analyzed in detail and then examined the direct and indirect effects of both the no action and proposed action alternatives. AR24-25, 32-33, 6693, 6695-98. The EA's analyses of effects to wildlife are supplemented by the Forest Service's BAs and Biological Evaluations (BEs). AR454-533, 6241-252, 6253-333, 7519-573, 85909-956, 85792-908. The BAs and BEs provide rigorous evaluations of the Projects' effects on Federally listed species and their critical habitat within the Projects' areas. AR482-93, 6294-95, 6304-310, 6241-252, 7558-564, 85930-934, 85944-953. The BAs and BEs identify the action areas, known species and critical habitat in the Projects' areas, proposed actions, best management practices, project design features, and the environmental baseline. AR519-29, 6313-316, 7530-532, 85927-930. For each listed species known to be in the Projects' areas, the BAs and BEs analyze the Projects' direct, indirect, and cumulative effects on listed species and their critical habitat. AR482-93, 6294-95, 6304-310, 6241-252, 7558-564, 85930-934, 85944-953. For listed species where the Forest Service determined that the Projects would have some effect, as defined by the ESA, the Forest Service completed consultation with FWS. AR85788-791, 85792-908, 89945-

950, 90019-021. The Forest Service's EAs and the incorporated analysis in the BAs and BEs fully satisfy the Agency's NEPA obligations to analyze effects to Federally listed species and their critical habitat. *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 650.

Plaintiffs' primary argument is that the EAs themselves do not discuss or minimize the potential negative impacts on species, and the BAs and BEs do not provide site-specific wildlife habitat analysis. Pls'. Mem. 21. This argument fails to acknowledge that the EAs' analyses incorporate by reference the agency's BAs, BEs, and consultations with the FWS. 40 C.F.R. § 1501.12; *City of Sausalito*, 386 F.3d at 1214. Documents in the Administrative Record beyond the EAs show how the Forest Service satisfied its obligations under NEPA to examine the relevant factors to support a finding of no significant impacts. *Nw. Env'tl Advocs.*, 460 F.3d at 1139; 40 C.F.R. § 1501.12.

For the Pacific Fisher, the Castle and Windy Project EAs determined the Projects may affect but it is not likely to adversely affect fishers and its critical habitat. AR32, 6695. The Forest Service Castle Project BA examined 10,946 acres of high-quality reproductive habitat and the Windy Project BA analyzed 10,161 acres of high-quality reproductive habitat prior to the recent fires. AR6294, AR85917. Both Projects BAs and BEs utilized recent studies and surveys to determine recent fires continue to threaten quality species habitat. AR6275, 6278-280, 6679, 85917-923. The Projects proposed fuel reduction treatments to improve habitat conditions would not lessen the acres of high-quality reproductive habitat. AR33, 6690. The Projects adverse effects are short-term impacts on habitat due to the loss of snags and large down woody materials and slight noise disturbances. AR6251, 85930-932. The Forest Service developed Project design criteria to maintain habitat features and restore desired conditions for reproductive fisher habitat over the next decade. AR521, 6293-95, 6242-43, 671-12, 85944-953.

For the California Spotted Owl, the Castle Project EA incorporated the BA which analyzed all 48,664 acres of suitable habitat in the burn perimeter. AR485. The Project focuses treatment on high severity burn areas, only resulting in decreased foraging suitability on 4,979 acres where dead trees will be removed. AR465, 487. The Project is unlikely to further fragment owl habitat, however because not all areas will be treated, nor will all hazard trees be removed.

AR487. In the Windy Project, the Forest Service found the Project will not have a significant impact because the treatment areas also contain unsuitable habitat and owls are unlikely to utilize the areas due to the condition of the understory. AR7560. Project treatment activities may displace roosting owls if they occur within the immediate area, however given the condition of habitat, the proposed restoration treatments benefits significantly outweigh the limited potential impacts because implementation of the Project will eventually improve habitat suitability for the species. Both Projects' BA and BE utilized regional owl strategies to analyze threats, risk factors, and adverse effects, and to develop design features—preserving key habitat—that will minimize impacts to the species. AR 460, 462-463 470-475, 485-489, 7560, 7568, 7572, 7531.

For the goshawk, the Castle EA summarizes the Project's direct and indirect effects, finding the Project "slightly reduc[es] habitat quality due to a loss of some important habitat elements, mainly snags and down woody material. However, there would be no change in the number of acres of suitable habitat for these species in the analysis area." AR33. The BE provides more analysis and shows that hazard tree removal activities implemented outside the breeding season may have only minor impacts, temporarily displacing birds. AR482-83. Similarly, the Windy EA summarizes the effects analysis and says the goshawk has the potential to occur in the Project area or otherwise be affected by the Project. AR6696-97. The BE concludes the goshawk is not anticipated to be impacted by the Project because the treatment area contains unsuitable habitat and there are unlikely to be goshawks in treatment areas. AR7560. Limited disturbances of individual goshawks are possible, but it is not likely to result in a trend toward Federal listing or loss of viability for the species. *Id*. The Forest Service analyzed and developed site-specific design features to protect nest trees from damage during project implementation and limited operating periods to minimize the Project effects. AR483-485, 7531.

Plaintiffs' cases do not support their claim that the Forest Service downplayed or minimized effects to the species to avoid an in-depth analysis of the Projects' environmental effects to the fisher, owl, or goshawk. In *Earth Island Institute v. U.S. Forest Service*, the Ninth Circuit found that the Forest Service did not adequately examine effects to owls because it overestimated tree mortality and thus underestimated suitable habitat. 442 F.3d 1147, 1172 (9th

1    Cir. 2006). Here, the Forest Service conducted rigorous analyses of the habitat in the burn

2    perimeters, including surveys for fisher, owls, and goshawk. AR482-489, 6241-252, 7556-561,

3    85909-956. The detailed information in these Projects' records provides a reasoned basis for the

4    Forest Service's conclusions, and is far more information than just the estimates in *Earth Island*.

5    442 F.3d at 1172. Unlike *WildEarth Guardians v. Montana Snowmobile Association*, the

6    environmental analyses were publicly available on the Forest's website, on request, or both. 790

7    F.3d 920, 927 (9th Cir. 2015) Plaintiffs also cite *Oregon Natural Resources Council v. Brong*,

8    but the cited portion pertains to substantive land management standards under the Federal Land

9    Policy and Management Act (akin to NFMA), not procedural claims under NEPA. Pls.' Mem.

10   21-22 (citing 492 F.3d 1120, 1130 (9th Cir. 2007)). The NEPA portion of *Brong* does not help

11   Plaintiffs, either, because the Forest Service provided useful analyses of the Projects' effects on

12   the three species, not just conclusory statements of past harm. 492 F.3d at 1133-34.

13         The Forest Service provided sufficient information and detail to evaluate the Projects'

14   effects on the fisher, owl, and goshawk. The information in the EAs, BAs, BEs, and elsewhere in

15   the record support the Forest Service's reasoned analysis and conclusion of no significant

16   impacts to these species. NEPA does not require the exhaustive level of analysis Plaintiffs desire

17   *Nw. Env'tl Advocs.*, 460 F.3d at 1139; (*Klamath Forest All. v. U.S. Forest Serv.*, No. 3:23-cv-

18   3601-RFL, 2024 WL 4017202, at *7 (N.D. Cal., Aug. 23, 2024) (rejecting some of the same

19   Plaintiffs' challenge to the analysis of impacts to wildlife because "Plaintiffs do not adequately

20   explain why the specific maps and geographical information they request were needed for the

21   Forest Service to adequately assess impacts on wildlife or for informed public participation.")

22         3.   The Forest Service considered and disclosed cumulative effects.

23         Cumulative effects or impacts are "effects on the environment that result from the

24   incremental effects of the action when added to the effects of other past, present, and reasonably

25   foreseeable actions." 40 C.F.R. § 1508.1(g)(3). An agency must provide "some quantified or

26   detailed information" when considering cumulative impacts. *Ocean Advocs. v. U.S. Army Corps

27   of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005). "An agency may 'characterize the cumulative

28   effects of past actions in the aggregate without enumerating every past project that has affected

an area.'" *Ctr. for Env'tl Law & Pol'y v. U.S. Bureau of Reclamation.*, 655 F.3d 1000, 1007 (9th Cir. 2011). An agency may also aggregate previously approved projects and reasonably foreseeable projects into the environmental baseline, so long as those projects are identified. *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1112-13 (9th Cir. 2015). "[A] cumulative impact analysis is insufficient if it discusses only the direct effects of the project at issue on a small area or merely contemplates other projects but had no quantified assessment of their combined impacts." *Ctr. for Cmty. Action and Env'tl Justice v. FAA*, 61 F.4th 633, 644-45 (9th Cir. 2023) (cleaned up).

The EAs explain that the Forest Service analyzed cumulative effects by considering past, present, and reasonably foreseeable actions relevant to the Projects. AR33-35, 6699-6701. Consistent with regulatory requirements, the Forest Service considered past actions in the aggregate and listed ongoing and reasonably foreseeable future actions. AR34, 6700; 40 C.F.R. § 1508.1(g)(3); 36 C.F.R. § 220.4(f). The Forest Service considered only those projects and actions within the relevant spatial and temporal boundaries perimeter. AR34 (Castle, identifying ten years of activities within the fire perimeter), 6700 (Windy, identifying activities in the vicinity or overlapping the Project area for between one and ten years). After explaining how cumulative effects were analyzed, the EAs provide a summary of the cumulative effects for each issue analyzed in detail. AR 34-35; 6700-701. Additional documents, such as the BAs, BEs, and various specialists' reports contain additional information and analysis of cumulative effects. *See* AR 346, 484, 488, 489, 491, 493 (Castle Project botany and wildlife BE); AR854-58 (Castle Project hydrology effects analysis); AR 911-12 (Castle Project soils effects analysis); AR7563 (Windy Project wildlife BE); AR7308-09 (Windy Project Migratory Birds report); AR7467-72 (Windy Project watershed and soils technical report).

Plaintiffs' cumulative effects argument fails for three reasons. First, they complain the EAs fail to provide "sufficient" quantified or detailed information about cumulative effects and contain little reference to material supporting conclusions. Pls'. Mem. 23. This argument narrowly focuses on the EAs themselves and fails to acknowledge the EAs incorporate by reference other documents that include additional analyses of cumulative effects. 40 C.F.R. §

1501.12. As for the level of detail, "NEPA requires not that an agency engage in the most

exhaustive environmental analysis theoretically possible, but that it take a 'hard look' at relevant

factors." *Nw. Env'tl Advocs.*, 460 F.3d at 1139. Plaintiffs demand for endless detail in the EAs

does not prove the Forest Service's cumulative effects analysis is arbitrary and capricious.

Second, Plaintiffs fail to acknowledge the principle of aggregation. For past actions, the

relevant regulations "do not require agencies to catalogue or exhaustively list and analyze all

individual past actions." 36 C.F.R. § 220.4(f); 40 C.F.R. § 1508.1(g)(3); *Ctr. for Env'tl Law*, 655

F.3d at 1007. For ongoing and reasonably foreseeable projects, the Forest Service identified the

projects in the EAs and considered their effects in the aggregate. AR34, 6700. Plaintiffs claim

the Forest Service omitted three projects from the cumulative effects analyses. Pls.' Mem. 24

(citing the French Fire Restoration Project from both Projects' analyses and the Windy Project

from the Castle Project's analysis); *Id.* 25-26 (citing the 2023 Tule River Indian Reservation

salvage sale). None of these projects had sufficiently defined activities at the time of the

Projects' analyses.[6] *Ark Initiative v. U.S. Forest Serv.*, No. 06–cv–02418–WDM–MJW, 2010

WL 3323661, at *8 (D. Colo. Aug. 18, 2010) ("At the time that the scope of the EA was

determined, the Forest Service concluded that [another project] was not sufficiently definite to be

included in the [cumulative impacts] analysis.") , *aff'd*, 660 F.3d 1256 (10th Cir. 2011). And

while the Castle and Windy Project are adjacent, the Forest Service did not have to include it

each in the others' cumulative effects analysis. *Friends of the Wild Swan v. Weber*, 767 F.3d 936,

944 (9th Cir. 2014) ("Although Wild Swan argues the agency should have also considered

effects from the neighboring project because the lands are adjacent, the agency has to draw a line

somewhere and has offered a reasonable justification for why it drew the line where it did.").

Third, the level of detail Plaintiffs want simply is not required for the Forest Service to

make an informed decision about the Projects' cumulative effects. Plaintiffs say they want

additional information about "acreages, effects, or resources that may be cumulatively affected"

including species such as goshawk, California Spotted Owls, and fisher. Pls.' Mem. 24-25. The

---

[6] French Fire Restoration Project Scoping began June 12, 2023.
https://www.fs.usda.gov/project/sequoia/?project=64293

1  Administrative Record includes the BAs, BEs, Addendum to the BA, specialists reports, and
2  dozens of scientific studies that adequately consider cumulative effects to species.[7] Nowhere do
3  Plaintiffs explain how this information is inadequate, or how additional information was needed
4  for an informed decision. *See Ctr. for Envt'l Law*, 655 F.3d at 1007; *Ctr. for Sierra Nevada*
5  *Conservation v. U.S. Forest Serv.*, 832 F.Supp.2d 1138, 1160 (E.D. Cal. 2011) (lack of site-
6  specific data regarding various specific road issues and impacts did not prevent the
7  environmental analysis from sufficiently "foster[ing] both informed decision-making and
8  informed public participation."); *Bark v. BLM*, 643 F. Supp. 2d 1214, 1223 (D. Or. 2009) (NEPA
9  does not require "a cataloguing of all past, present, and foreseeable projects by listing the time,
10  type, place, scale, different plans and methods, without regard to the usefulness of this data.").

11  "NEPA requires not that an agency engage in the most exhaustive environmental analysis
12  theoretically possible, but that it take a 'hard look' at relevant factors." *Nw. Env'tl Advocs.*, 460
13  F.3d at 1139. Plaintiffs' demand for ever more information, without explaining how that
14  information would contribute to an informed decision, does not show that the Forest Service's
15  decisions are arbitrary and capricious.

16     4.   The Forest Service disclosed effects to naturally-regenerating conifer seedlings and
17          considered Plaintiffs' comments on post-fire logging.

18  The Forest Service analyzed the Projects' effects to naturally-regenerating conifer
19  seedlings in both its EAs and specialist reports. AR16, 23, 29, 46, 6683, 6709 (EAs); AR265,
20  273, 289 (Castle Vegetation Report); AR7374-76 (Windy Fire, Fuels and Air Quality Report). In
21  response to comments, the Forest Service added design criteria to address concerns about salvage
22  and fuels reductions treatments and to protect sequoia seedlings in areas of successful
23  regeneration. AR6, 62 (VE-8, GS-1, GS-2), 6671, 6720 (bullet points 7, 9, 10). These added
24  design features disprove Plaintiffs' allegation that the Forest Service "simply brushed aside these
25  concerns." Pls.' Mem. 27.

26
27  [7] *See, e.g*, AR222-1053 (Castle supporting documents), 6786-8261 (Windy supporting
   documents), 454-533 (Castle BE), 7519-7573 (Windy BE), 6253-333 (Castle BA), 6241-52
28  (Castle fisher addendum), 6334-6339 (Castle Biological Opinion), 90360-98 (Windy BA),
   85909-56 and 85788-91 (Windy fisher addendum and concurrence), 89951-83 and 89945-50
   (Addendum to BA for wolves and concurrence).

Finally, Plaintiffs allege the Forest Service did not adequately analyze effects of post-fire timber harvest because the Agency "shrugged off" studies they submitted. *Id*. Even in an EIS, an agency is not required to respond to every single scientific study or comment – only "responsible" opposing views that were not already discussed. 40 C.F.R. § 1502.9(c). This regulation does not apply here for several reasons. First, it applies only to EISs, not EAs. *Id.*; *Earth Island Inst.*, 697 F.3d at 1021. Second, as Plaintiffs admit, the Forest Service acknowledged the studies and explained there are "differing views about the effectiveness of fuel treatments." Pls.' Mem. 27 (citing AR69, 6728, 8270-71). "[A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378. Third, Plaintiffs' studies involved vegetation treatments that opened the canopy of a *green* forest and the potential for the forest to dry out and potentially have a faster moving fire. AR4476-78. 83806-808. Plaintiffs' studies simply do not apply to these two Projects that are located in post-fire landscapes that include substantial areas of high tree mortality. The only case Plaintiffs cite is *Bark v. U.S. Forest Service*, 958 F.3d 865, 871 (9th Cir. 2020), which found the Forest Service's authorization of a variable density thinning timber project was arbitrary and capricious because the Agency did not address arguments raised during the administrative process that questioned whether variable density thinning reduced the risk of wildfires. The Ninth Circuit subsequently limited *Bark*, holding that the contrary view must be about the same types of authorized activities. *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 639-40 (9th Cir. 2023) (explaining that "the Projects here cannot be characterized as involving variable density thinning" and "the project in *Bark* contemplated thinning without subsequent prescribed burns, the thinning here…will be conducted in preparation for prescribed burns."). The Forest Service was not required to give detailed responses to Plaintiffs' irrelevant studies about different vegetation treatments in pre-fire ecosystems.

In sum, Plaintiffs' narrow focus on the EAs themselves fails to show that the Forest Service's analyses of the environmental effects was arbitrary and capricious. NEPA requires incorporation by reference and allows for aggregation. 40 C.F.R. § 1501.12; *see City of*

1    *Sausalito*, 386 F.3d at 1214; *Cascadia Wildlands*, 801 F.3d at 1112. NEPA does not require the

2    level of detail that Plaintiffs demand. *Nw. Env'tl Advocs.*, 460 F.3d at 1139. When the Court

3    reviews the EAs and supporting documentation under the rule of reason, it should decline

4    Plaintiffs' invitation to fly-speck the NEPA analyses and should grant summary judgment for the

5    Forest Service on Count Two of Plaintiffs' NEPA claim.

6    **D.    <u>The FONSIs are not arbitrary or capricious</u>**.

7         Plaintiffs third NEPA claim challenges the adequacy of the FONSIs and alleges the

8    Forest Service must prepare EISs. Pls.' Mem. 27-30; Compl. ¶¶ 229-40 (NEPA Count Three). A

9    FONSI "may be overturned only if it is 'arbitrary, capricious, an abuse of discretion, or

10   otherwise not in accordance with law.'" *Anderson v. Evans*, 371 F.3d 475, 486 (9th Cir. 2004).

11   In reviewing an agency's finding that a project has no significant effects, courts employ an

12   arbitrary and capricious standard to determine whether the agency has taken a "hard look" and

13   provided a convincing statement of reasons to explain why a project's impacts are insignificant.

14   *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014)). An agency can

15   rely on its own expert reports and technical expertise in concluding that the impact of a project

16   would be insignificant. *See Native Ecosystems Council*, 428 F.3d at 1244.

17        1.    <u>The FONSIs summarize the Forest Service's analyses and are entitled to deference.</u>

18        As required by NEPA's implementing regulations, the Forest Service considered the

19   degree of effects of the proposed actions, including all four enumerated effects. 40 C.F.R. §

20   1501.3(b)(2); AR40-43, 6653-54 (considering short and long-term effects, beneficial and adverse

21   effects, effects on public safety, and effects that would violate Federal, State, Tribal, or local law

22   protecting the environment). The FONSIs summarize the analyses in the EAs; identify reports,

23   appendices, laws, and regulations; and inform the reader of the bases for the Forest Service's

24   findings of no significant impact. *See Id.* The FONSIs are fully informed and support the Forest

25   Service's determination that the Projects do not have any significant effects within the meaning

26   of NEPA. *Marsh*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an

27   agency must have discretion to rely on the reasonable opinions of its own qualified experts even

28

if, as an original matter, a court might find contrary views more persuasive."); *Native Ecosystems Council*, 428 F.3d at 1244.

Plaintiffs' chief complaint is that the FONSIs *themselves* do not analyze the Projects' environmental effects. *See, e.g.*, Pls.' Mem. 28 (complaining that the FONSIs "are comprised of mere conclusory assertions, devoid of any supporting rationale."). Plaintiffs' argument misses the mark: the FONSIs are *summaries* of the analyses contained elsewhere in the EAs and Administrative Record, which are precisely what NEPA's implementing regulations require. 40 C.F.R. § 1501.6(b) (the FONSI "shall include the environmental assessment or incorporate it by reference and shall note any other environmental documents related to it."); *see also* 40 C.F.R. § 1501.12 (requiring incorporation by reference). Plaintiffs' argument that the FONSIs should contain the Forest Service's analyses – rather than reference them – also goes against NEPA's regulations that limit the text of an EA to 75 pages (excluding appendices or written approval). 40 C.F.R. § 1501.5(f); see also 40 C.F.R. § 1501.5(c)(1) (requiring agency to "briefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or [FONSI].").

Plaintiffs then argue that "[o]ther recent similarly-sized projects support the need to prepare an EIS." Pls.' Mem. 28. Plaintiffs reason that because the Forest Service prepared EISs for two different projects with similar or smaller footprints, the Forest Service must also prepare EISs here. *Id.* 28-29. But "significance varies with the setting of the proposed action," not in comparison to other past actions. 40 C.F.R. § 1501.3(b)(1). Plaintiffs cite no authority that size equates to significance within the meaning of NEPA. Courts that have considered this argument have rejected it. *W. Watersheds Proj. v. Perdue*, No. CV-21-00020-TUC-SHR, 2023 WL 6377287, at *12 (D. Ariz. Sept. 29, 2023) ("While this is a large Project – spanning across two states and multiple national forests – Plaintiffs do not point to, and the Court is unaware of, any authority holding large projects necessarily have a significant environmental impact."); *Klamath Forest All.*, 2024 WL 4017202, at *10 ("[T]he large size of the Projects, alone, does not necessarily raise a substantial question as to significant environmental impacts.").[8]

---

[8] Additionally, the two projects cited by Plaintiffs (Tule River and Rim Fire) were authorized in 2014 and 2016, respectively, predate the conditions created by the Castle and Windy Fires, and were analyzed under the prior NEPA regulations with completely different requirements for determining significance. *Compare* 40 C.F.R. § 1501.3(b)(2) (enumerating four effects to DEF.'S OPENING MEM.

2. <u>Plaintiffs have not met their burden to raise substantial questions.</u>

Plaintiffs' second and final challenge to the FONSIs is a broad assertion that the Projects "may" have significant impacts. Pls.' Mem. 29-30. Plaintiffs first simply reference and recycle "all the reasons discussed above," without identifying a single, specific "substantial question" about the validity of the Forest Service's FONSIs. Pls.' Mem. 29. Plaintiffs' conclusory, catch-all argument fails to meet their burden to show the existence of substantial questions. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992) ("An agency must prepare an EIS if substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor." (cleaned up)).

Plaintiffs then argue that the Forest Service "fell back on project design features to reduce potential adverse effects." Pls.' Mem. 29. Plaintiffs' argument and supporting case law shows that they mistakenly believe the Projects' FONSIs are "mitigated FONSIs," in which an agency uses mitigation to render the otherwise significant impacts of a project not significant. 40 C.F.R. § 1501.6(c); *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 987 (9th Cir. 1985) ("[C]ourts have permitted the effect of mitigation measures to be considered in determining whether preparation of an [EIS] is necessary."); *City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1033 (9th Cir. 1998) ("[A]n agency may condition its decision not to prepare a full EIS on adoption of mitigation measures."); *see also* 40 C.F.R. § 1508.1(s) (defining mitigation). The challenged analyses are not mitigated FONSIs because the Forest Service does not rely on mitigation measures to attain a finding of no significant impact. *See* AR40-43, 6649-56.

The Projects do contain design features, but these are implementation measures the Forest Service uses to minimize or eliminate potential negative effects, as well as to comply with forest plan direction and other law, policy, or regulation. *See, e.g.*, AR41 (Castle FONSI noting "mitigation measures are in place to reduce the hazard [to firefighters] from falling trees or limbs during project implementation."); AR6653 (Windy FONSI noting that short- and long-term effects "will be monitored and mitigated to minimize adverse effects."); *see also* AR51-63

---

consider) *with* 40 C.F.R. § 1508.27 (2018) (consideration of context and ten intensity factors). That the Forest Service found two different projects under different NEPA regulations had significant effects has no bearing on whether the two Projects challenged here have significant effects.

(Castle Appx. C, Management Requirements and Project Design Features), AR6711-20 (Windy Appx. B, same). Plaintiffs' demand for an evaluation of the efficacy of the dozens of design features for wildlife, habitat, and every other resource is not required because none of the Projects' design features are used to lessen the environmental effects to attain a mitigated FONSI as contemplated by NEPA's implementing regulations. 40 C.F.R. § 1501.6(c); *Friends of Animals v. Haaland*, No. 3:22-CV-00365-ART-CLB, 2024 WL 3599148, at *6 (D. Nev. July 30, 2024); *Klamath Forest All.*, 2024 WL 4017202 at *10 ("[S]uch an analysis is only required where the agency has found the proposed action will have significant impacts and is relying on mitigation measures to offset those effects after the fact.").

Plaintiffs' cases are inapposite. Two involved mitigated FONSIs, where the agency adopted mitigation measures to offset what would otherwise be significant environmental effects. *Nat'l Park & Conserv. Ass'n. v. Babbitt*, 241 F.3d 722, 733 (9th Cir. 2001) ("The second source of uncertainty is the Parks Service's ability to offset the environmental impact of the increase in vessel traffic through its proposed mitigation measures."); *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1176 (9th Cir. 1982) ("[B]ecause Alternative B adequately mitigated the potential harm to the sheep, the action would have no significant effect on the quality of the human environment and therefore no EIS was required."). The third involved an EIS – not an EA and FONSI – where the agency already determined there would be significant environmental effects. *S. Fork Band Council of W. Shoshone v. U.S. Dep't of the Interior*, 588 F.3d 718, 727 (9th Cir. 2009).

In sum, the FONSIs provide a convincing statement of reasons for why the Forest Service concluded the Projects do not have significant environmental effects within the meaning of NEPA. Plaintiffs have not met their burden to show the Forest Service's reasoning is arbitrary and capricious, nor have they met their burden to raise substantial questions about the FONSIs. The Court should find the Forest Service provided a reasonable basis for why EISs were not required and grant summary judgment for the Forest Service on Count Three of Plaintiffs' NEPA Claim. *In Def. of Animals*, 751 F.3d at 1068.[9]

---

[9] In passing, and with no analysis, Plaintiffs ask the Court to vacate the Project EAs, FONSIs, and DNs. Pls.' Mem. 30. The Forest Service satisfied its statutory obligations under NFMA and DEF.'S OPENING MEM.

CASE NO. 1:24-CV-00473-KES-HBK                                                                29

## VI.    Conclusion

For all these reasons, the Court should defer to the scientific judgment and expertise of the Forest Service and find that Plaintiffs have not met their burden to show that the Castle or Windy Projects are arbitrary and capricious. The Court should grant summary judgment for the Forest Service on all claims and deny Plaintiffs' motion for summary judgment in its entirety.

DATED: September 6, 2024         TODD KIM
                                 Assistant Attorney General
                                 Environment and Natural Resources Division
                                 United States Department of Justice

                                 */s/ Lawrence K. Pittman*
                                 JOHN P. TUSTIN (TX Bar No. 24056458)
                                 Senior Attorney
                                 LAWRENCE PITTMAN (GA Bar. No. 568134)
                                 Trial Attorney
                                 Natural Resources Section
                                 P.O. Box 7611
                                 Washington, D.C. 20044-7611
                                 Phone:    (202) 305-3022 (Tustin)
                                           (202) 305-0420 (Pittman)
                                 Fax:      (202) 305-0275
                                 john.tustin@usdoj.gov
                                 lawrence.pittman@usdoj.gov

                                 *Attorneys for Defendant*

---

NEPA. However, if the Court concludes that the Forest Service erred, it should permit the Parties to brief remedy. A court has wide discretion to fashion an appropriate remedy. *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 541-42 (1987). The determination of "[w]hether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Cal. Cmtys. Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012) (cleaned up). Unless or until a specific violation is established, it will not be clear what a reasonable remedy might be.